**RECORD NO. 09-10**

In The

# United States Court of Appeals
### For The Fourth Circuit

## UNITED STATES OF AMERICA,

*Plaintiff – Appellee*,

**v.**

## RICHARD ALLEN JACKSON,

*Defendant – Appellant*.

## ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF NORTH CAROLINA AT ASHEVILLE

———————

## BRIEF OF APPELLANT

———————

| | |
|---|---|
| **M. Gordon Widenhouse, Jr.** | **Shelagh R. Kenney** |
| RUDOLF, WIDENHOUSE & FIALKO | CENTER FOR DEATH |
| **312 West Franklin Street** | PENALTY LITIGATION |
| **Chapel Hill, North Carolina 27516** | **201 West Main Street, Suite 301** |
| **(919) 967-4900** | **Durham, North Carolina 27701** |
| | **(919) 956-9545** |
| *Counsel for Appellant* | *Counsel for Appellant* |

THE LEX GROUP ♦ 1108 East Main Street ♦ Suite 1400 ♦ Richmond, VA 23219
(804) 644-4419 ♦ (800) 856-4419 ♦ Fax: (804) 644-3660 ♦ www.thelexgroup.com

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . v

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF JURISDICTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

ISSUES PRESENTED FOR REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

STATEMENT OF THE FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

    A.    Trial evidence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

    B.    Post-Trial Admission of Guilt by Bob Lunsford . . . . . . . . . . . . . . 12

    C.    Post-Trial Developments About Stun Gun Evidence . . . . . . . . . . . 13

REQUEST FOR CERTIFICATE OF APPEALABILITY . . . . . . . . . . . . . . . . . 15

SUMMARY OF THE ARGUMENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

ARGUMENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

    I.    THE DISTRICT COURT ERRED IN DENYING RICHARD JACKSON'S MOTION TO VACATE, WITHOUT AN EVIDENTIARY HEARING, BASED ON UNCONTRADICTED, NEW EVIDENCE SHOWING SOMEONE ELSE PARTICIPATED IN THE CRIME AND REVEALING SERIOUS MISTAKES IN THE GOVERNMENT'S THEORY OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

        Standard of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

        Discussion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

i

A.    New Evidence Shows Another Person Participated in the Crimes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

B.    New Evidence Of Another Participant Is Material and Compelling . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

C.    Evidence of Third-Party Involvement Is Constitutionally Relevant . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

D.    Government Introduced the Wrong Murder Weapon  . . . . . . 29

E.    New Evidence Creates Questions About Federal Jurisdiction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

F.    Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

II.    THE DISTRICT COURT ERRONEOUSLY DENIED THE MOTION TO VACATE WHERE UNCONTRADICTED EVIDENCE SHOWED TRIAL COUNSEL RENDERED INEFFECTIVE ASSISTANCE IN FAILING TO DEVELOP AND PRESENT EVIDENCE THAT WOULD HAVE THOROUGHLY DISCREDITED AND REFUTED THE CONTENTION THAT THE VICTIM WAS TORTURED WITH A STUN GUN . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

Standard of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

Discussion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

III.    THE DISTRICT COURT ERRONEOUSLY DENIED THE MOTION TO VACATE WHERE TRIAL COUNSEL RENDERED INEFFECTIVE ASSISTANCE IN FAILING TO PROVIDE THE EXPERT LINK BETWEEN RICHARD JACKSON AND HIS SEVERELY IMPAIRED BIOLOGICAL SISTER ABOUT WHOM COMPELLING MITIGATING EVIDENCE COULD HAVE BEEN PRESENTED . . . . . . . . . . . . . 51

Standard of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

ii

Discussion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

IV.    THE DISTRICT COURT ERRED IN DENYING THE MOTION
       TO VACATE DUE TO INEFFECTIVE ASSISTANCE OF
       COUNSEL IN FAILING TO PRESENT AVAILABLE
       MITIGATING EVIDENCE THAT COULD HAVE LED NOE
       JUROR TO RETURN A LIFE SENTENCE . . . . . . . . . . . . . . . . . . 59

       Standard of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

       Discussion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

V.     THE DISTRICT COURT ERRONEOUSLY DENIED THE
       MOTION TO VACATE BASED ON DOUBLE JEOPARDY
       WHERE THE STATE COURT HAD PREVIOUSLY
       PROSECUTED AND PUNISHED RICHARD JACKSON FOR
       THE SAME CRIMES AND ACTS . . . . . . . . . . . . . . . . . . . . . . . . . 65

       Standard of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

       Discussion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

VI.    THE DISTRICT COURT ERRONEOUSLY DENIED RICHARD
       JACKSON AN EVIDENTIARY HEARING ON AND FINDS
       TO DEVELOP HIS MOTION TO VACATE WHERE THE
       EVIDENCE, TAKEN IN A LIGHT MOST FAVORABLE TO
       HIM, DID NOT CONCLUSIVELY SHOW HE WAS NOT
       ENTITLED TO RELIEF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

       Standard of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

       Discussion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

       A.    Standard for Granting an Evidentiary Hearing Under
             Section 2255 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

       B.    District Court Resolved Credibility Issues Without a
             Hearing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75

iii

C.    District Court Wrongly Denied Requests for Expert
Assistance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 79

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF FILING AND SERVICE

iv

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Abbate v. United States*,
 359 U.S. 187 (1959) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67, 68, 69

*Alcala v. Woodford*,
 334 F.3d 862 (9th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

*Barefoot v. Estelle*,
 463 U.S. 880 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

*Bartkus v. Illinois*,
 359 U.S. 121 (1959) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67, 68, 69

*Benton v. Maryland*,
 395 U.S. 784 (1969) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

*Cagle v. Branker*,
 520 F.3d 320 (4th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Caro v. Calderon*,
 165 F.3d 1223 (9th Cir. 1999), *cert. denied*,
 527 U.S. 1044 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34, 38

*Chambers v. Mississippi*,
 410 U.S. 284 (1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Crane v. Kentucky*,
 476 U.S. 683 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26-27

*Cunningham v. Zant*,
 928 F.2d 1006 (11th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

*Daubert v. Merrell Dow Pharmaceuticals*,
 509 U.S. 579 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 39

*Del Piano v. United States*,
    362 F.2d 931 (3d Cir. 1966) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

*Driscoll v. Delo*,
    71 F.3d 701 (8th Cir. 1995), *cert. denied*,
    519 U.S. 910 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Dugas v. Coplan*,
    428 F.3d 317 (1st Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*Fontaine v. United States*,
    411 U.S. 213 (1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76

*Gray v. Branker*,
    529 F.3d 220 (4th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 59

*Hart v. Gomez*,
    174 F.3d 1067 (9th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

*Heath v. Alabama*,
    474 U.S. 82 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

*Holm v. United States*,
    507 U.S. 924 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Holmes v. South Carolina*,
    547 U.S. 319 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26, 27

*Kandies v. Polk*,
    385 F.3d 457 (4th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Lindstadt v. Keane*,
    239 F.3d 191 (2d Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

*Machibroda v. United States*,
    368 U.S. 487 (1962) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 72, 73

*Maryland v. Craig*,
    497 U.S. 836 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

vi

*McFarland v. Scott*,
       512 U.S. 849 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76

*Miller v. Anderson*,
       255 F.3d 455 (7th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*Miller-El v. Cockrell*,
       537 U.S. 322 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 71

*Patrick v. Johnson*,
       48 F. Supp. 2d 645 (N.D. Tex. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . 78

*Pecoraro v. Wells*,
       286 F.3d 439 (7th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Raines v. United States*,
       423 F.2d 526 (4th Cir. 1970) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76

*Romero v. United States*,
       327 F.2d 711 (5th Cir. 1964) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

*Rompilla v. Beard*,
       545 U.S. 374 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

*Schiebelhut v. United States*,
       357 F.2d 743 (6th Cir. 1966) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

*Scott v. United States*,
       349 F.2d 641 (6th Cir. 1965) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

*Slack v. McDaniel*,
       529 U.S. 473 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71

*Smith v. United States*,
       348 U.S. 147 (1954) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*State v. Jackson*,
       348 N.C. 52, 497 S.E.2d 409, *cert. denied*,
       525 U.S. 943 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 25

vii

*Strickland v. Washington*,
466 U.S. 668 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34, 50, 59

*Tennard v. Dretke*,
542 U.S. 274 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Townsend v. Sain*,
372 U.S. 293 (1963) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76

*United States v. Belyea*,
159 Fed. Appx. 525 (4th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*United States v. Brainard*,
690 F.2d 1117 (4th Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . 27, 28

*United States v. Custis*,
988 F.2d 1355 (4th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*United States v. Fulcher*,
250 F.3d 244 (4th Cir.), *cert. denied*,
534 U.S. 939 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 24

*United States v. Gray*,
878 F.2d 702 (3d Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

*United States v. Grimes*,
641 F.2d 96 (3d Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

*United States v. Jackson*,
327 F.3d 272 (4th Cir.), *cert. denied*,
540 U.S. 1019 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*United States v. LaFleur*,
971 F.2d 200 (9th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*United States v. Lanza*,
260 U.S. 377 (1922) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67, 68, 69

*United States v. Lemaster*,
    403 F.3d 216 (4th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

*United States v. Nicholson*,
    475 F.3d 241 (4th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76

*United States v. Poindexter*,
    492 F.3d 263 (4th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . 20, 33, 52, 59

*United States v. Raffield*,
    82 F.3d 611 (4th Cir.), *cert. denied*,
    519 U.S. 933 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*United States v. Robinson*,
    238 Fed. Appx. 954 (4th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . 75-76

*United States v. Salerno*,
    290 F.2d 105 (2d Cir. 1961) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

*United States v. Singh*,
    54 F.3d 1182 (4th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*United States v. Stitt*,
    552 F.3d 345 (4th Cir. 2008), *cert. denied*,
    130 S. Ct. 65 (2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*United States v. Todd*,
    657 F.2d 212 (8th Cir. 1981), *cert. denied*,
    455 U.S. 926 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*United States v. Unger*,
    665 F.2d 251 (8th Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73

*United States v. Witherspoon*,
    231 F.3d 923 (4th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 70

*Wiggins v Smith*,
    539 U.S. 510 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47, 58-59, 60

ix

*Williams v. Taylor*,
    529 U.S. 362 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

**CONSTITUTIONAL PROVISION**

U.S. CONST. amend. V . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65, 68, 69

**STATUTES**

18 U.S.C. § 7(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

18 U.S.C. § 924(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

18 U.S.C. § 924(j)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 31

18 U.S.C. § 1111 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

18 U.S.C. § 1111(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

18 U.S.C. § 1111(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

18 U.S.C. § 3236 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

18 U.S.C. § 3592(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

18 U.S.C. § 3592(a)(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

18 U.S.C. § 3592(c)(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

18 U.S.C. § 3592(c)(9) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

18 U.S.C. § 3599 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70, 77

21 U.S.C. § 1291 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

21 U.S.C. § 848(q) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70, 76

21 U.S.C. § 848(q)(4)(B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77

21 U.S.C. § 848(q)(9) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77

28 U.S.C. § 2253 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

28 U.S.C. § 2255 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

**<u>RULES</u>**

Fed. R. Evid. 104 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56, 57

Fed. R. Evid. 104(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

Fed. R. Evid. 104(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56, 57

Fed. R. Evid. 804(b)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

**<u>OTHER AUTHORITIES</u>**

Advisory Committee Notes to Rule 5, Rules Governing Section 2255 Cases . . . 72

David L. Faigman et al., 3 *Modern Scientific Evidence* § 29-1.0 (2002) . . . . . . . 30

MEDICOLEGAL INVESTIGATION OF DEATH: GUIDELINES FOR THE
APPLICATION OF PATHOLOGY TO CRIME INVESTIGATION
        (Werner U. Spitz et al. eds., 1973, 1980, 1993, 2006) . . . . . . . . . . . . . . . 43

Steven A. Drizin & Richard A. Leo, "The Problem of False Confessions in
The post D.N.A. World," 82 N.C. L. Rev. 891 (2004) . . . . . . . . . . . . . . . . . . . . 25

U.S. Attorney's Manual, Section 9-2.031(A) . . . . . . . . . . . . . . . . . . . . . . . . . . 68

USA Patriot Improvement and Reauthorization Act of 2005,
Pub. L. No. 109-177, Title II, §§ 221(4), 222(a), 120 Stat. 192 (2006) . . . . . . . . 77

**INTRODUCTION**

Richard Jackson's convictions and sentence of death resulted from a myriad of constitutional and procedural deprivations. Without conducting an evidentiary hearing in the face of uncontradicted facts that entitle Mr. Jackson to relief, the district court denied the motion to vacate. This ruling must be reversed for several reasons.

First, Robert Lunsford has admitted participating in these crimes. This new evidence directly related to the degree of Mr. Jackson's involvement in and responsibility for the crimes and, concomitantly, the propriety of a death sentence. It called into question many of the details of Mr. Jackson's confession, supported new defense theories, and raised doubt about the federal court's jurisdiction. Although the evidence showed Mr. Jackson, acting alone, abducted and killed Karen Styles in a national forest, the new evidence not only indicated Lunsford was involved, but also showed Styles was kept in an abandoned house in Asheville for several days before she was killed. If so, the murder not only occurred outside the special territorial jurisdiction of the United States, but also was not done with the gun introduced at trial, which had been returned to a store. Despite the materiality of this new evidence to a proper determination of guilt, the propriety of a death sentence, and the existence of federal jurisdiction, the district court summarily dismissed it without an evidentiary hearing.

1

Second, Mr. Jackson presented uncontradicted expert testimony from four scientists that the red marks on her body were caused by post-mortem insect activity, not a stun gun as hypothesized by the government. The government's purported stun-gun expert, whose opinion has now been repudiated by four renowned experts, and who himself has disclaimed the validity of the method he used, examined autopsy photographs and opined Styles received numerous wounds from a stun gun. His testimony was essentially uncontested at trial. No defense experts testified because trial counsel failed to investigate and secure experts to challenge this inflammatory testimony. But as Mr. Jackson showed in this litigation, the government's expert was incorrect. His methods were not scientifically reliable, according to the opinions of the four experts in biomedical and clinical engineering, forensic entomology, and forensic pathology, all of which the district court simply ignored. [JA 2066-80, 2321-22] This evidence demonstrated the trial testimony that the victim was tortured with a stun gun, which unquestionably impacted the jury, was untenable in light of accepted scientific scrutiny. Yet the district court rejected this claim, again without an evidentiary hearing, despite the uncontradicted proffer of four experts, primarily because this Court found no abuse of discretion in the admission of the testimony.[1] [JA 2074, 2078] But this Court was unaware of the serious questions about the

---

[1]*See United States v. Jackson*, 327 F.3d 272, 298 (4th Cir.), *cert. denied*, 540 U.S. 1019 (2003).

methodology and analysis of the government's witness and did not have the benefit of the opinions of the four experts. This Court should be disturbed by the use of such an unreliable and unqualified witness to secure a conviction and death sentence. At the very least, but for the ineffective assistance of trial counsel, critical contrary evidence could have been presented to prevent the admission of the government's evidence or at least blunt its undeniable impact on the jury with compelling and dramatic contradiction. Taking the opinions of these four experts as true, the district court should not have summarily dismissed this claim of ineffective assistance of counsel without an evidentiary hearing.

Third, due to several glaring deficiencies by defense counsel, the sentencing jury did not hear the full story about Mr. Jackson. During their mitigation investigation, defense counsel learned Mr. Jackson's biological sister, Wilma, who had been adopted by another family, had significant emotional and behavioral problems of her own. Wilma's adopted parents had significant, compelling information to offer the jury about Mr. Jackson's condition. They saw signs of autistic behavior, excitability, inappropriate laughing, withdrawal, and resistance to environmental changes. As Wilma grew older, her problems worsened as she became sexually promiscuous and exhibited dramatic mood swings. One psychiatrist found her homicidal. She was finally diagnosed with Asperger's Disorder and currently lives in a residential care facility. Defense counsel had a mental health professional

3

available who could have provided a biological connection between Wilma's developmental disorders and other mental health conditions and Mr. Jackson's characteristics. During the penalty phase, defense counsel sought to introduce the testimony of Phillip and Alice Allen, Wilma's adoptive parents. But defense counsel failed to properly present this evidence.

In addition, as a result of defense counsel's failure to present all available mitigation evidence, the government argued in its sentencing summation that there was no evidence to support many of the mitigating circumstances submitted by defense counsel. "They talk about the mitigation evidence, all this stuff about how bad his family life was and all these hard times and sexual abuse and all of that. Folks, there's no evidence of that." (Tp. 1483) Indeed, as this Court noted, "the evidence [in the record] in favor of mitigation was limited."[2] Trial counsel did not present available lay testimony about his traumatic childhood and his continuing mental health problems throughout his adolescence and early childhood. The sentencing phase of a capital case necessitates a broad inquiry into all relevant mitigating evidence to allow an individualized decision about the appropriate punishment. The key to such "individualized determination" is an adequate mitigation effort where the defendant's background and character are fully presented to the jury. Again, despite the importance of this proffered evidence and the absence

---

[2]*Jackson*, 327 F.3d at 294.

of a conclusive showing that the deficient performance would not entitle Mr. Jackson to relief, the district court summarily dismissed these claims without an evidentiary hearing.

Finally, the district court contorted the record to avoid an evidentiary hearing by its wholesale rejection of six affidavits: three from Mr. Jackson's trial attorneys and three from other experienced attorneys, two of whom were respected capital litigators who reviewed the efforts of trial counsel and offered concrete statements about the shortcomings. The district court denied Mr. Jackson a hearing at which he could qualify them as experts. These affidavits, by attorneys whose qualifications, credentials, and credibility as seasoned capital litigators have not been even remotely challenged by the government or disputed by the district court, provided evidence of trial counsel's ineffectiveness by explaining specific acts of omission and commission that were outside the bounds of accepted standards for attorney performance. They would not have usurped the district court's authority by providing a legal conclusion on an ultimate issue of law as to the legal standard for ineffective assistance of counsel. Rather, they would have explained specific actions trial counsel should (or should not) have taken. For example, both were very familiar with Mr. Jackson's case because they knew many of the players involved and lived and worked in the community where the crimes and the legal proceedings took place. They reviewed many of the materials in this action, including the section 2255 motion to vacate and

the affidavits from Mr. Jackson's three attorneys, each of whom they knew well. Their ultimate conclusions about the quality of the legal representation highlights the legal error in excluding these affidavits. Their observations about whether the performance of counsel met the existing standards for performance in a capital case was relevant and pertinent information the district court should have considered. These affidavits at least required an evidentiary hearing. The district court was similarly dismissive of trial counsel's affidavits, which explained in detail many ways in which their trial preparation fell short of constitutional standards, conclusively labeling them as mere attempts to create a reversal. In doing so, the district court speculated as to their motivations and impermissibly made credibility determinations without conducting an evidentiary hearing.

As explained in more detail below, the district court's judgment cannot stand. This Court must issue a certificate of appealability and vacate the judgment.

<b><u>STATEMENT OF JURISDICTION</u></b>

The district court had jurisdiction over this matter pursuant to 28 U.S.C. § 2255. This Court has jurisdiction over this appeal pursuant to 21 U.S.C. § 1291 and 28 U.S.C. §§ 2253, 2255. The district court entered its original judgment on 19 June 2009. A timely motion to alter or amend was denied on 26 August 2009. Richard Allen Jackson gave timely gave notice of appeal on 26 October 2009 from the final judgment entered on 26 August 2009. This appeal is from a final order.

6

## ISSUES PRESENTED FOR REVIEW

I.    WHETHER THE DISTRICT COURT ERRED IN DENYING RICHARD JACKSON'S MOTION TO VACATE, WITHOUT AN EVIDENTIARY HEARING, BASED ON UNCONTRADICTED, NEW EVIDENCE SHOWING SOMEONE ELSE PARTICIPATED IN THE CRIME AND REVEALING SERIOUS MISTAKES IN THE GOVERNMENT'S THEORY OF THE CASE.

II.   WHETHER THE DISTRICT COURT ERRONEOUSLY DENIED THE MOTION TO VACATE WHERE UNCONTRADICTED EVIDENCE SHOWED TRIAL COUNSEL RENDERED INEFFECTIVE ASSISTANCE IN FAILING TO DEVELOP AND PRESENT EVIDENCE THAT WOULD HAVE THOROUGHLY DISCREDITED AND REFUTED THE CONTENTION THAT THE VICTIM WAS TORTURED WITH A STUN GUN.

III.  WHETHER THE DISTRICT COURT ERRONEOUSLY DENIED THE MOTION TO VACATE WHERE TRIAL COUNSEL RENDERED INEFFECTIVE ASSISTANCE IN FAILING TO PROVIDE THE EXPERT LINK BETWEEN RICHARD JACKSON AND HIS SEVERELY IMPAIRED BIOLOGICAL SISTER ABOUT WHOM COMPELLING MITIGATING EVIDENCE COULD HAVE BEEN PRESENTED.

IV.   WHETHER THE DISTRICT COURT ERRED IN DENYING THE MOTION TO VACATE DUE TO INEFFECTIVE ASSISTANCE OF COUNSEL IN FAILING TO PRESENT AVAILABLE MITIGATING EVIDENCE THAT COULD HAVE LED ONE JUROR TO RETURN A LIFE SENTENCE.

V.    WHETHER THE DISTRICT COURT ERRONEOUSLY DENIED THE MOTION TO VACATE BASED ON DOUBLE JEOPARDY WHERE THE STATE COURT HAD PREVIOUSLY PROSECUTED AND PUNISHED RICHARD JACKSON FOR THE SAME CRIMES AND ACTS.

**VI.    WHETHER THE DISTRICT COURT ERRONEOUSLY DENIED RICHARD JACKSON AN EVIDENTIARY HEARING ON AND FUNDS TO DEVELOP HIS MOTION TO VACATE WHERE THE EVIDENCE, TAKEN IN A LIGHT MOST FAVORABLE TO HIM, DID NOT CONCLUSIVELY SHOW HE WAS NOT ENTITLED TO RELIEF**.

<u>STATEMENT OF THE CASE</u>

After his conviction and sentences were affirmed, Richard Jackson timely filed a motion to vacate, supported by forty-one affidavits.  [JA 42-1509]  He requested funds for investigations and experts, all of which were denied except a small amount for a private investigator.  [JA 1510-20, 1521-40, 1541-44, 1671-1730, 1735-45]  He twice moved to amend the motion based on materials disclosed by the government.  [JA 1545-1588]  The government answered and moved for dismissal.  [JA 1746-1962]  Without conducting an evidentiary hearing, the district court denied the motion.  [JA 1963-2214]  It then denied a timely motion to alter or amend the judgment and a request for a certificate of appealability. [2312-26, 2330-58]  Mr. Jackson timely appealed. [JA 2327-29]

<u>STATEMENT OF THE FACTS</u>

A.    **Trial evidence**[3]

On 31 October 1994, Karen Styles disappeared from a trail in the Pisgah National Forest.  After she failed to return home, a search began that revealed no trace

---

[3]  This factual summary is from the opinion of this Court.  *Jackson*, 327 F.3d at 279-81.

8

of her. However, her car was still parked at the lot at the head of the trail. Her car key was found on the trail two-tenths of a mile from the parking lot.

A little more than three weeks later, a hunter discovered her nude body duct-taped to a tree. Investigators also found a duct-tape wrapper, a pornographic magazine, and one spent Remington .22 caliber rifle casing. An autopsy revealed Styles died from a single bullet wound to the head. There were red marks on her body, one on her breast and nine within six inches of her pubic area. Investigators recognized from the duct-tape wrapper that the brand was sold at K-Mart. When sheriff's deputies contacted the nearest K-Mart store, about a mile from the site, they found a receipt dated October 28 for a .22 rifle, a box of Remington .22 rifle ammunition, duct tape, a flashlight, and batteries. The rifle was purchased by Mr. Jackson.

On 20 December 1994, Mr. Jackson voluntarily went to the local sheriff's department. He waived his *Miranda* rights and answered questions for approximately three hours about his background and whereabouts when Styles disappeared. When asked what he did with the rifle, Mr. Jackson responded, "I think I need a lawyer present." The sheriff then told Mr. Jackson he would not ask him any more questions and stated, "Son, I know you bought the rifle and the duct tape at K-Mart on the 28th of October. I know you were in Bent Creek on the day she was killed, and that's fine, but you need help." At this point, Mr. Jackson broke down, crying and insisting that

9

he did not mean to kill anybody. After the officers told him he did not need to say anything, Mr. Jackson said he wanted to tell the whole story to get it off of his chest. He then signed another waiver of his *Miranda* rights.

Mr. Jackson said he arrived at the park around 8:00 a.m. and watched Styles as she stretched and walked down the trail. After sitting for a while, he took the gun out of the back of the car, loaded it, and started down the trail. He had duct tape, a stun gun, and a pornographic magazine in his coat pockets. After Styles passed him on the trail, Mr. Jackson turned around and pointed the gun at her. She took a key out of her shoe, told him there was money in her car, and said he could take the car. She pleaded with him not to hurt her. Mr. Jackson placed duct tape over her eyes and mouth and led her to a remote area, where he stood her with her back to a tree and duct-taped her to it. The duct tape on Styles' mouth had come loose, and she again asked him not to hurt her. Mr. Jackson taped her mouth shut again, ripped off her shorts and underpants, and raped her vaginally. He did not mention using a stun gun. A government witness opined Styles had been shocked with a stun gun once above her left breast and several times in the pubic area. Mr. Jackson moved away from Styles and looked at his pornographic magazine while masturbating. The tape over Styles' mouth came loose. She began screaming. He walked up to her, put the gun to her head, and shot her one time. Later that day, he returned the gun to the K-Mart.

10

Mr. Jackson was crying during his entire confession. At times during the interview, the officers could not understand his words. He repeated many times he did not mean to kill Styles.

Police later searched Mr. Jackson's home and cars. They found a functional stun gun, a flashlight, a black "Ninja" outfit, a wrapper to an adult magazine, and a partially empty box of .22 caliber rifle bullets.

After his motion to suppress his confession was denied, Mr. Jackson was convicted in state court for first degree murder, first degree kidnapping, and first degree rape. The trial court imposed a death sentence for murder and consecutive sentences for rape and kidnapping. The convictions were reversed because police violated Mr. Jackson's constitutional right by interrogating him after he invoked his right to counsel. *See State v. Jackson*, 348 N.C. 52, 56-57, 497 S.E.2d 409, 412 (1998).

On remand, Mr. Jackson pled guilty in state court to second degree murder, first degree rape, and second degree kidnapping. He was sentenced to over 31 years in prison. None of his lawyers considered the possibility of a federal prosecution or advised him he could be subject to federal prosecution.

A federal grand jury indicted Mr. Jackson for using a firearm during and in relation to a crime of violence. *See* 18 U.S.C. § 924(j)(1). The jury returned a guilty verdict. During the sentencing phase, the government presented the testimony of the

11

victim's mother, and the defense presented the testimony of Mr. Jackson's adoptive mother. The defense also attempted to offer the testimony of the adoptive parents of Mr. Jackson's natural sister, who suffered behavioral disorders, but the district court did not allow this testimony without expert testimony linking her mental condition to Mr. Jackson. The jury found four aggravating factors, including that Styles' death occurred during the commission of the offense of kidnapping and that the crime was done in an especially heinous, cruel, or depraved manner because it involved torture or serious physical abuse. The jury found fourteen mitigating circumstances. It unanimously recommended a death sentence.

## B.    Post-Trial Admission of Guilt by Bob Lunsford

After Mr. Jackson's trial and appeal, the government disclosed new information that Bob Lunsford admitted to the abduction of Styles. [JA 1564-80, 1684-85] Kristy Clement, who knew and had worked with Lunsford, reported this confession. On 15 December 2003, Kristy ran into Lunsford and invited him to her brother Darren's residence. Kristy had suspected he had something to do with Styles' disappearance. That night, she asked him if he was involved in the murder. [JA 1567-68, 1687] Lunsford told her they had considered getting Kristy and her sister instead of Styles. [JA 1567-68] Darren confirmed Kristy brought Lunsford to his house and told him she thought Lunsford had something to do with Styles' murder. At Kristy's direction, Darren set up a tape recorder behind some books and began

12

taping. [JA 1569-70] Darren believed Lunsford was going to kill him after having confessed his involvement to Kristy and Darren. [JA 1571] Later, Darren called Tommy Candler and told him Lunsford said he and Mr. Jackson took Styles to an old house in West Asheville for a few days. Eventually, Lunsford left. [JA 1571] Jeffrey Spivey later heard Lunsford implicated himself in the homicide. [JA 1575]

When government spoke with Lunsford, he denied having any involvement in the Styles' incident. [JA 1573-74] He asked to take a polygraph to verify his truthfulness. [JA 1574] He took two polygraph examinations. [JA 2409-28] The first test was inconclusive. [JA 2423-24] The second test indicated Lunsford was deceptive when he denied participating in any way in the abduction and in the shooting of Styles. [JA 1579-80, 2411-12]

### C.    Post-Trial Developments About Stun-Gun Evidence

Mr. Jackson presented substantial expert opinions that wholly contradicted the government's claim about a stun gun having been used in these crimes. Dr. Joseph Dyro, an internationally recognized biomedical and clinical engineering expert, critiqued the government's expert opinion about a stun gun in numerous ways. With regard to the so-called "signature" marks purportedly in the crime scene photographs, Dr. Dyro noted the marks had not been histologically examined to link the marks to electrical energy originating from a stun gun. Instead, the government expert "worked backwards from a picture to conclude" that "red spots on a body that have

13

varying size, shapes, [and] intensity" were made by a "stun gun."  [JA 295, 296]

Dr. Dyro explained,  "Nothing in the scientific literature supports this methodology.

Indeed, from my own examination of crime scene photographs, I cannot conclude that

the marks were caused by a stun gun.  The marks could have been caused by insects

or a number of other events."  [JA 293]  The marks the expert attributed to

mechanical thrusting of the stun-gun probe into the victim's body were not

scientifically supportable, in part, because there are "no experiments or data in the

literature that control for the known force, pressure, or speed with which a stun gun

is moved across the skin." [JA 295]  Indeed, it was learned the government's expert

himself had expressed a similar opinion when he testified in a case in 1994,

something neither he not the government revealed.  He had said, "I know of no

reputable expert in the field . . . who would render anything close to an unqualified

causation opinion based on these photographs."  [JA 1209-11, 1206]

Dr. Dyro also examined the very photographs upon which Dr. Stratbucker

relied and he noted, "I do not think it is scientifically possible to conclude these

marks were caused by a stun gun.  There are no regular patterns.  There are varying

spacing.  The marks have different sizes, different shapes, and different colorations.

The wide variation of the marks depicted in these photographs makes it impossible

to conclude they were caused by a stun gun.  There is not a convincing set of marks

to suggest a stun gun, and especially a specific stun gun, was used." [JA 293-94]

14

This opinion is striking. It directly contradicts the testimony of the government's expert. Had the district court been furnished with this contrary opinion, certainly in tandem with the expert's own disavowal of the process, it would likely have excluded the testimony. Dr. Dyro's analysis and conclusions were fully supported by three other experts: Jason Byrd, Ph.D., an accomplished forensic entomologist; Dr. Werner Spitz, a pre-eminent forensic pathologist; and John D. Butts, M.D., Chief Medical Examiner for the State of North Carolina, who authored the autopsy report. All of these experts opined the marks on the victim's body were caused by insects, not a stun gun.

## **REQUEST FOR CERTIFICATE OF APPEALABILITY**

Mr. Jackson requested a certificate of appealability from the district court on several issues including the government's revelation of new evidence that another person admitted participating in the crimes; several claims of ineffective assistance of counsel (such as failing to develop and present expert testimony about stun guns and testimony about important mitigating evidence); the violation of his right to be free from double jeopardy; and the denial of an evidentiary hearing. The district court denied a certificate of appealability on each of these issues. Mr. Jackson requests a certificate of appealability on the issues in this preliminary brief.

The appropriate standard governing the determination of whether a certificate of appealability should issue is straightforward. A petitioner must show that

15

reasonable jurists could debate whether the issues should have been resolved in a different manner or that the issues were adequate to deserve encouragement to proceed further. *Tennard v. Dretke*, 542 U.S. 274, 282 (2004); *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003). Mr. Jackson deserves an opportunity to proceed further with the claims raised herein. This Court has previously determined that reasonable jurists could disagree about the merits of similar claims and has granted certificates of appealability. *See, e.g., Gray v. Branker*, 529 F.3d 220 (4th Cir. 2008); *Cagle v. Branker*, 520 F.3d 320 (4th Cir. 2008); *Kandies v. Polk*, 385 F.3d 457 (4th Cir. 2004). These issues could be debated by reasonable jurists and are sufficient to justify encouraging Mr. Jackson to proceed farther with them.

## SUMMARY OF THE ARGUMENTS

I. After Richard Jackson was convicted, the government disclosed evidence calling into question many of the details of his confession, supporting new theories of defense, and casting substantial doubt about whether the federal court had jurisdiction. The trial evidence showed he acted alone in the abduction and killing. But the new evidence revealed a second perpetrator was involved and indicated the victim was removed from the national forest before she was killed. It also means the murder was not done with the gun introduced at trial and did not occur within the special territorial jurisdiction of the United States. Because the new evidence is

16

material to guilt, sentence, and jurisdiction, the motion to vacate should have been granted.

II.  Richard Jackson's trial lawyers were ineffective in failing to challenge competently testimony by Robert Stratbucker, who merely examined autopsy photographs and opined Karen Styles received numerous wounds from a stun gun. This evidence was challenged only by minimal cross-examination unaided by any experts. Although the district court took great pains to laud trial counsel with respect to this issue, while lamenting their opinions as efforts to "[fall] on their swords, admitting all manner of professional incompetencies in the singular goal of removing the sentence of death from the reality of this case," it ignored the gravamen of this issue: trial counsel manifestly failed to present readily available expert testimony that Dr. Stratbucker's methodology and determinations were wholly unreliable. The district court erred in completely ignoring the contrary opinions of four renowned experts as well as the revelation that Dr. Stratbucker himself repudiated the methodology he used in this case. The motion to vacate should have been granted.

III.  During the penalty phase, defense counsel sought to introduce evidence that Wilma, Mr. Jackson's biological sister, had significant emotional and behavioral problems. Due to the nature of these problems, counsel determined this information concerning Mr. Jackson's biological sister was critical, relevant information for the jury's consideration as to his sentence. Although defense counsel had an expert who

17

could link the information about Wilma to Mr. Jackson, they declined to offer it to the district court. Their failure to argue a more expansive theory of admissibility of this compelling evidence and to proffer expert testimony to establish the necessary connection was the product of poor preparation, a misunderstanding of the law, and an unfounded fear that any expert testimony showing the connection of a genetic medical condition between Mr. Jackson and his biological sister would open the door to rebuttal from government mental health experts. They did not anticipate a relevance challenge to the admissibility of the evidence and did not understand the full scope of the biological and genetic link between Wilma's conditions and Mr. Jackson's problems, which could be established through expert testimony outside the presence of the jury. This ineffective representation requires reversal.

IV. Trial counsel opted to present only one witness in mitigation: Sally Jackson. They did not offer a broad range of supporting witnesses, all of whom would testify consistent with the defense theory in mitigation. They could have provided defense counsel with significant information concerning his difficulties as a child and young adult, information that would have been important to the jury. This evidence would have been mercy-invoking evidence that painted Mr. Jackson as a human being worthy of sympathy and compassion. It was unreasonable not to introduce this other evidence as it allowed the prosecutor to argue nothing supported

18

the mitigation except Sally Jackson, who was trying to help her adopted son. Under these circumstances, the performance was deficient and prejudiced Mr. Jackson.

V. No person can be twice be tried or punished be subject for the same offense. This plain reading of the constitutional prohibition of double jeopardy is clear. Yet Richard Jackson was twice put in jeopardy of his life and punished for the same offense: the killing, kidnaping, and sexual assault of Karen Styles. Although this Court rejected this constitutional claim on the merits because its hands were tied by "existing precedents," the dual sovereignty doctrine exception to double jeopardy is at odds with the original meaning and text of the Constitution. It is also no longer necessary to protect federal interest in prosecutions for matters that have historically been left to the states. This issue should be reconsidered.

VI. Richard Jackson was entitled to a hearing on his motion to vacate "unless the motion, files, and record conclusively showed that he was not entitled to relief." The district court failed to heed this statutory mandate when it denied Mr. Jackson's motion without an evidentiary hearing. The district court also failed to provide him with funding for reasonably necessary services, including multiple experts, so he could fairly litigate his claims. This case must be remanded for an evidentiary hearing with appropriate funding.

19

## ARGUMENTS

**I.      THE DISTRICT COURT ERRED IN DENYING RICHARD JACKSON'S MOTION TO VACATE, WITHOUT AN EVIDENTIARY HEARING, BASED ON UNCONTRADICTED, NEW EVIDENCE SHOWING SOMEONE ELSE PARTICIPATED IN THE CRIME AND REVEALING SERIOUS MISTAKES IN THE GOVERNMENT'S THEORY OF THE CASE.**

**Standard of Review**: This Court reviews the denial of a motion to vacate where no hearing was held by taking the evidence in the light most favorable to the movant. *United States v. Poindexter*, 492 F.3d 263, 267 (4th Cir. 2007). A district court's determination of legal questions is reviewed de novo. *United States v. Stitt*, 552 F.3d 345, 350 (4th Cir. 2008), *cert. denied*, 130 S. Ct. 65 (2009).

**Discussion**: After Richard Jackson was convicted, the government disclosed evidence relating to the degree of his involvement in and culpability for the crimes and to the propriety of a death sentence. This new evidence calls into question many of the details of his confession, supports new theories of defense, and casts substantial doubt on whether the federal court had subject matter jurisdiction over this case. While the evidence at trial tended to show Mr. Jackson acted alone in the abduction and death of Karen Styles within the Pisgah National Forest, the new evidence reveals a second perpetrator was involved who committed some of the acts ascribed to Mr. Jackson. The new evidence shows Styles was removed from the national forest and kept in an abandoned house in Asheville for several days before

20

she was killed.  The government's theory at trial is drastically different in light of the evidence it later disclosed: another person admitted to participating in the abduction of Styles.  It also means the murder was not done with the gun introduced at trial and did not occur within the special territorial jurisdiction of the United States.  Where new, material evidence is discovered that could not have been previously discovered by due diligence and would likely have produced a different result, a new trial or at least a new sentencing hearing is required.  *E.g.*, *United States v. Fulcher*, 250 F.3d 244, 249 (4th Cir.), *cert. denied*, 534 U.S. 939 (2001).  Because the new evidence is material to Mr. Jackson's guilt, the propriety of a death sentence, and the existence of federal jurisdiction, this Court must reverse the denial of the motion to vacate.[4]

## A.    New Evidence Shows Another Person Participated in the Crimes.

In December 2004, the government disclosed new information that Bob Lunsford, who had a reputation for violence, admitted to participating in the abduction of Karen Styles. [JA 1564-80, 1684-85] Federal investigators interviewed

---

[4] As argued specifically in Argument VI, the district court erred in denying the motion to vacate without conducting an evidentiary hearing.  *See* 28 U.S.C. § 2255 (requiring hearing unless facts "*conclusively* show that the prisoner is entitled to no relief") (emphasis added); *see also Machibroda v. United States*, 368 U.S. 487, 494-95 (1962) (evidentiary hearing necessary where issues related to events outside the courtroom and beyond record); *United States v. Witherspoon*, 231 F.3d 923, 926 (4th Cir. 2000) (remanding section 2255 proceeding to district court for hearing where proffered evidence did not conclusively show defendant not entitled to relief for ineffective assistance).  In particular, with regard to this new evidence, the facts in no way conclusively show Mr. Jackson is entitled to no relief.

21

several people who knew of this dramatic admission. Most significantly, Kristy Clement reported this confession. Kristy had worked with Lunsford, who was a dishwasher at the restaurant owed by Mr. Jackson's adoptive father. Immediately after Styles disappeared, Lunsford left this job and began working at a fast food restaurant. [JA 1567-68] Kristy ran into Lunsford and invited him to her brother Darren's residence on 15 December 2003. Later that night, Kristy, who was afraid of Lunsford (whom she described as "creepy, crazy, and possibly dangerous") and had long suspected he had something to do with Styles' disappearance because she considered him dangerous, asked Lunsford directly if he was involved in the murder. [JA 1567-68, 1687] He said, "Wait, wait, let me tell you something." [JA 1568] During the ensuing conversation, Lunsford stated they had considered getting Kristy and her sister, meaning they intended to abduct and kill her and her sister instead of Styles. [JA 1567-68]

Darren spoke with government agents and confirmed Kristy brought Lunsford to his house. While the three were drinking, Kristy told her brother she had a hunch Lunsford had something to do with Styles' murder. At Kristy's direction, Darren set up a tape recorder behind some books and began taping. [JA 1569-70] Darren believed Lunsford was going to kill him after having confessed his involvement to Kristy and Darren. [JA 1571]

Sometime later, Darren called Tommy Candler and told him Lunsford said he and Mr. Jackson took Styles to an old house under renovation in West Asheville, where Lunsford had done some work. They kept Styles at the house for a few days. Eventually, Lunsford left. [JA 1571] Jeffrey Spivey had also been with Tommy, Kristy, Darren, and Lunsford. Spivey later heard Lunsford implicated himself in a homicide. [JA 1575]

Government agents also interviewed Lunsford. Unsurprisingly, he denied having anything to do with the abduction and murder. [JA 1573-74] However, he asked to take a polygraph examination to verify his truthfulness to the agents. [JA 1574] Accordingly, the FBI administered polygraph examinations to Lunsford on two occasions. [JA 2409-28] The first polygraph test was inconclusive. [JA 2423-24] The second polygraph test indicated Lunsford was deceptive when he answered "no" to the following questions: (1) Did you participate in any way in the abduction of Karen Styles? and (2) Did you participate in any way in the shooting of Karen Styles? [JA 1579-80, 2411-12]

**B.    New Evidence Of Another Participant Is Material and Compelling.**

Whether a defendant is entitled to a new trial on the basis of newly discovered evidence involves a five-part analysis.

23

(a) [T]he evidence must be, in fact, newly discovered, i.e. discovered since the trial; (b) facts must be alleged from which the court may infer diligence on the part of the movant; (c) the evidence relied on must not be merely cumulative or impeaching; (d) it must be material to the issues involved; and (e) it must be such, and of such nature, as that, on a new trial, the newly discovered evidence would probably produce an acquittal.

*Fulcher*, 250 F.3d at 249 (quoting *United States v. Custis*, 988 F.2d 1355, 1359 (4th Cir. 1989)); *United States v. Singh*, 54 F.3d 1182, 1190 (4th Cir. 1995). But the district court did not follow this controlling standard in evaluating this new evidence. Rather, the district court summarily rejected this evidence, without conducting a hearing, because Mr. Jackson never mentioned Lunsford's involvement and because the new evidence does not show "the conviction and sentence are constitutionally invalid." [JA 2208-11] When a district court errs in determining a legal question, review is de novo. *Stitt*, 552 F.3d at 350. Contrary to the district court's truncated analysis, Mr. Jackson met the requirements for a new trial.

First, evidence that Lunsford admitted his involvement in Styles' abduction was unknown and unavailable to Mr. Jackson at the time of trial and could not have been discovered with due diligence. According to the FBI interviews of witnesses, Lunsford implicated himself in the crime in December 2003, more than two years after the trial. [JA 1563-80] The information was first made known to defense counsel by the government in December 2004, and defense counsel did not obtain the results of Lunsford's polygraph tests until March 2005. [JA 1564-80, 2375-2428]

24

Furthermore, Mr. Jackson's trial counsel had developed other information prior to trial suggesting a third party might have been involved in the offenses. However, defense counsel was unable to use the information at trial because he was unable to connect it to any particular individual. [JA 1582-84] Absent any clue from any source that Lunsford might have been involved, Mr. Jackson could not with due diligence have discovered the evidence implicating Lunsford.[5]

Second, the new evidence is not merely cumulative or impeaching. No evidence was presented at trial suggesting Lunsford or any other third party was involved in the crime. Moreover, no evidence at trial showed (1) anyone took Styles away from the Pisgah National Forest prior to her death or (2) Styles was held captive somewhere in Asheville for several days. Thus, the new evidence does not

---

[5] The district court's indication that this claim is without merit because Mr. Jackson himself never disclosed this information in his confession [JA 2208-09] misses the mark. First, it ignores the likelihood that Mr. Jackson would not have implicated Lunsford because he was "crazy, creepy, and possibly dangerous" with a reputation for being violent. [JA 1567-68, 1687] Second, Mr. Jackson's confession, which was obtained in violation of his constitutional rights, *see State v. Jackson*, 348 N.C. 52, 57, 497 S.E.2d 409, 412, *cert. denied*, 525 U.S. 943 (1998), was taken when he was emotionally distraught. Third, confessions are often false or at least factually incomplete, as this Court has recently noted. *See United States v. Belyea*, 159 Fed. Appx. 525, 530 (4th Cir. 2005) (unpublished) (remanding for *Daubert* hearing regarding admissibility of expert testimony regarding false confessions); *see also Smith v. United States*, 348 U.S. 147, 148 (1954) (recognizing existence of voluntary false confessions); *Pecoraro v. Wells*, 286 F.3d 439, 446 (7th Cir. 2002) (noting there have been many false voluntary confessions, "contrary to common sense"); Steven A. Drizin & Richard A. Leo, "The Problem of False Confessions in the post D.N.A. World," 82 N.C. L. Rev. 891, 923 (2004).

corroborate any trial testimony but presents completely new and different facts from the trial evidence. It raises several new issues regarding what happened to Styles and when and where she died, thereby making plausible one or more theories of a defense not reasonably available during the trial.

Finally, the new evidence is material to both the guilt and penalty phases and is sufficiently compelling that it would likely lead to different results at a new trial. Specifically, the new evidence is material and probative of (1) whether Mr. Jackson's acts amounted to first degree murder; (2) whether the killing was especially heinous, cruel, or depraved or involved in substantial planning or premeditation, *see* 18 U.S.C. § 3592(c)(6) & (9) or otherwise warranted a death sentence; and (3) whether the federal court had jurisdiction.

### C.      Evidence of Third-Party Involvement Is Constitutionally Relevant.

This new evidence shows Lunsford participated in the crimes. This evidence is contrary to the government's theory that Mr. Jackson, acting alone, abducted and killed Styles in the Pisgah National Forest. This evidence creates a reasonable possibility a different result would have been reached as to either guilt or sentence if the jury had heard it. *See Holmes v. South Carolina*, 547 U.S. 319, 328-31 (2006) (excluding evidence of third-party guilt violates constitutional right to present compete defense). A defendant has a constitutional right to introduce relevant, favorable evidence that cannot be circumscribed by evidentiary rules. *Crane v.*

*Kentucky*, 476 U.S. 683, 690 (1986); *Chambers v. Mississippi*, 410 U.S. 284, 302 (1973). *Holmes* underscored this rule and invalidated a state rule excluding evidence that another person perpetrated the crime. *Id*. at 325-31. *Holmes* was premised on the importance of evidence that another person was involved in or committed the crime. *Id.* at 327. The new evidence fits this category.

Lunsford's statement to Kristy and Darren regarding his involvement would be admissible as a declaration against penal interest. *See* Fed. R. Evid. 804(b)(3) (statement admissible if tending to so expose declarant to criminal liability that no reasonable person would make it unless believing it true). A statement is admissible under Rule 804(b)(3) where it tends to amount to an admission of involvement in the crime. *United States v. Brainard*, 690 F.2d 1117, 1124 (4th Cir. 1983). In *Brainard*, a statement indicating the declarant "had an insider's knowledge" of the crime rendered it sufficiently against his interest to bring it within the scope of Rule 804(b)(3). *Id.* Because the statement had this effect, "a reasonable man in [the declarant's] position would not have made the statement unless he believed it to be true." *Id.* Similarly, a reasonable person in Lunsford's position would not have admitted his involvement to Kristy and Darren unless it was true.

Under Rule 804(b)(3), corroborating circumstances must indicate the trustworthiness of the statement. This inquiry focuses on the making of the statement, not the credibility of the declarant or the witnesses who report it. *Brainard*, 690 F.2d

27

at 1124. Lunsford had no reason to lie to Kristy and Darren. Someone had already been convicted of the crime. He had no reason to believe they would report his statement to the police. *Brainard*, 690 F.2d at 1125 (finding circumstantial corroboration where "no apparent reason for [declarant] to lie to his secretary since he had no knowledge that his statement would even be used on behalf of Brainard and Bittick"). Moreover, they thought Lunsford was going to make a credible admission because they attempted surreptitiously to record it. Darren believed Lunsford was confessing because he reported it to the police. Furthermore, the FBI examiner found Lunsford deceptive when he denied involvement in either the abduction or killing in the polygraph examination he requested. [JA 1579-80] This result strongly supports the truth of Lunsford's admission.[6]

The district court summarily rejected this new evidence, describing it as "Lunsford's drunken bravado" and deeming it "beyond contemplation" that Mr. Jackson would not have mentioned it to his attorneys. Indeed, the district court found it "only common sense" that Mr. Jackson would reveal this information to his attorneys.[7] [JA 2209] The admission was hardly "drunken bravado," as shown by the

---

[6] The results of the proffered expert testimony about the ballistics evidence, discussed in Argument II, also corroborates Lunsford's statement by indicating the rifle Mr. Jackson bought from and returned to K-Mart was not the murder weapon.

[7] The district court's notion of "common sense" is similarly meaningless as the "common sense" that no one would voluntarily make a false confession, a notion now firmly rejected. *See* n.5, *infra*.

results of the polygraph examinations of Lunsford conducted by the FBI. These results alone show the new evidence is reliable. In addition, substantial evidence indicated Lunsford was a dangerous and frightening person. [JA 1564-66, 1571, 1684-85, 1586-88] This violent disposition would deter Mr. Jackson from implicating Lunsford because Lunsford might harm him or people he loved. It was certainly not "beyond contemplation" that he would not mention it, without some evidence supporting this conclusory observation. At the very least, the district court could not reject this evidence without affording Mr. Jackson a hearing.

### D.     Government Introduced the Wrong Murder Weapon.

This evidence also shows the rifle introduced as the murder weapon did not cause Styles' death. According to Lunsford, Styles was taken to an abandoned house for several days. The trial evidence indicated Styles was shot with a rifle returned to a store the same day. *Jackson*, 327 F.3d at 280. If Styles was kept in an abandoned house for several days, she could not have been shot with this rifle. In addition, although ballistics evidence at trial purported to show a cartridge case found near Styles' body came from this rifle, it can now be attacked. [JA 416-17]

The field of ballistics is ripe for challenge. "Reported judicial examinations of the scientific evidence on which toolmark and firearms examination … expertise rests are remarkably few, and the resulting opinions tend to be both empty and opaque. While expert evidence on toolmarks and firearms identification is

29

universally admissible, the universal admissibility has come along with virtually no judicial evaluation of the validity of the underlying science or its application." David L. Faigman et al., 3 *Modern Scientific Evidence* § 29-1.0 (2002).

Lester Roane, an accredited ballistics expert, examined the government's evidence and reports. He concluded:

- The most significant markers for matching a fired cartridge case to a specific firearm are firing pin impressions, breech face markings, and extractor and/or ejector markings. These markings could not be matched in this case. My determination in this regard is shared by [FBI Agent] Whitler. [FBI Agent] Casper makes no assertion to the contrary.

- Mr. Casper's "match" relies solely on an alleged incidental mark made by the movement of the rifle bolt over the cartridge before it is chambered. My review of the microphotographs supporting the "match" indicates that the "match" is not impressive, and should at most be rated as "inconclusive."

- The rifle in question is a low cost, mass-produced, widely distributed firearm. Millions of them are in use in the US. Production rates in the late 1990's were about 200,000 per year. They all have interchangeable parts produced on high volume machines.

- Mr. Casper was unable to establish a "match" in any but one experiment, even though he examined many cartridge cases cycled through the evidence rifle.

- It is my opinion that Mr. Casper's investigation is not adequate to establish a "match" between the evidence rifle and the evidence cartridge case.

[JA 417] The new evidence creates a reasonable doubt about the weapon that killed Styles and who fired it.

30

**E.     New Evidence Creates Questions About Federal Jurisdiction.**

This new evidence also calls into question the jurisdiction of the federal court over Mr. Jackson.  The federal government has concurrent jurisdiction over national forest lands.  *United States v. Raffield*, 82 F.3d 611 (4th Cir.), *cert. denied*, 519 U.S. 933 (1996).  Mr. Jackson was charged in the superseding indictment with violating 18 U.S.C. § 924(c), § 924(j)(1), and § 7(3) by using a firearm "during and in relation to a crime of violence for which he may be prosecuted in a court of the United States," and for committing this offense "within the Special Territorial Jurisdiction of the United States, to wit: the Pisgah National Forest."

Section 924(j)(1) specifically provides a person may be punished by death or by imprisonment for life or for a term of years if he, in the course of a violation of § 924(c), "causes the death of a person through the use of a firearm" and "if the killing is a murder (as defined in section 1111)."  Federal jurisdiction over murder prosecutions is established by 18 U.S.C. § 1111(b), which makes commission of the homicide "[w]ithin the special maritime and territorial jurisdiction of the United States" an element and essential prerequisite for imposing a sentence of death or life imprisonment.  Thus, "[t]o be guilty of § 1111(a) murder, a defendant must have killed within a federal jurisdiction." *United States v. LaFleur*, 971 F.2d 200, 212 (9th Cir. 1991), *cert. denied*, *Holm v. United States*, 507 U.S. 924 (1993).  The district court instructed the jury consistently with these provisions.  (Tp. 1249)

31

A murder "shall be deemed to have been committed at the place where the injury was inflicted, or the poison administered or other means employed which caused death, without regard to the place where death occurs." 18 U.S.C. § 3236 (2005); *see United States v. Todd*, 657 F.2d 212, 215 (8th Cir. 1981), *cert. denied*, 455 U.S. 926 (1982). In *Todd*, an accomplice of the defendant struck the murder victim on the head at a bar located outside the boundaries of Fort Leonard Wood. Afterwards, the men left the victim in a wooded area within Fort Leonard Wood. "If [the victim] died as a result of the head wound [inflicted off a federal enclave], regardless of where the death occurred, there was not federal jurisdiction to hear the murder charge. If on the other hand [the victim] died of exposure after being left in the wooded area within the boundaries of Fort Leonard Wood, federal jurisdiction did exist." *Id.*

The evidence in Mr. Jackson's case showed the cause of death was a single gunshot wound. If the fatal wound was inflicted outside the national forest, federal jurisdiction was lacking, even if Styles later died there. This new evidence that Styles was held captive for several days outside the Pisgah National Forest creates doubt as to whether the fatal gunshot wound was inflicted on federal land. This evidence could have altered the result.

**F.      Conclusion**

The district court's dismissive treatment of this new evidence is indefensible. Without conducting a hearing and assessing credibility, it rebuffed strong indications that the crime did not occur as the government alleged at trial. This evidence could have had an effect on the trial or sentencing proceedings. Under these circumstances, the district court's judgment must be vacated.

**II.      THE DISTRICT COURT ERRONEOUSLY DENIED THE MOTION TO VACATE WHERE UNCONTRADICTED EVIDENCE SHOWED TRIAL COUNSEL RENDERED INEFFECTIVE ASSISTANCE IN FAILING TO DEVELOP AND PRESENT EVIDENCE THAT WOULD HAVE THOROUGHLY DISCREDITED AND REFUTED THE CONTENTION THAT THE VICTIM WAS TORTURED WITH A STUN GUN.**

**Standard of Review**: This Court reviews the denial of a motion to vacate where no hearing was held by taking the evidence in the light most favorable to the movant. *United States v. Poindexter*, 492 F.3d 263, 267 (4th Cir. 2007). A district court's determination of legal questions is reviewed de novo. *United States v. Stitt*, 552 F.3d 345, 350 (4th Cir. 2008), *cert. denied*, 130 S. Ct. 65 (2009).

**Discussion**: Richard Jackson's trial lawyers were ineffective in failing to investigate, prepare for, and secure a defense expert to challenge testimony about a stun gun being used in the crime. The government presented the testimony of Robert Stratbucker, who merely examined autopsy photographs and opined that Karen Styles received numerous wounds from a stun gun. This damaging evidence stood

33

essentially uncontested, challenged only by minimal cross-examination unaided by any expert. This inexcusable performance by trial counsel deprived Mr. Jackson of his constitutional rights because his "counsel's representation fell below an objective standard of reasonableness." *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984). In rejecting this claim, the district court unduly relied on this Court's analysis from the direct appeal that "[i]t was not reversible error to admit the expert testimony of Dr. Robert Stratbucker as to stun-gun evidence"[8] and unjustly credited trial counsel's cross-examination of Stratbucker, when trial counsel himself thought it was unacceptably deficient. [JA 253-54, 1970, 2073-80] It is of paramount importance to investigate, challenge, and rebut expert testimony in a capital case. *See Caro v. Calderon*, 165 F.3d 1223, 1226 (9th Cir. 1999), *cert. denied*, 527 U.S. 1044 (1999); *Driscoll v. Delo*, 71 F.3d 701, 708-09 (8th Cir. 1995), *cert. denied*, 519 U.S. 910 (1996). Although the district court took great pains to laud trial counsel with respect to this issue, while lamenting their opinions as efforts to "[fall] on their swords, admitting all manner of professional in competencies in the singular goal of removing

---

[8] This Court actually held the district court did not abuse its discretion in admitting this testimony based on the purported "analysis" Stratbucker provided the district court. *See Jackson*, 327 F.3d at 298. Axiomatically, this Court did not have before it the devastating expert opinions of Drs. Dyro, Byrd, Butts, and Spitz that were developed by Mr. Jackson in post-conviction and presented in support of his motion to vacate.

34

the sentence of death from the reality of this case," [JA 2164],[9] it ignored the fundamental premise of the challenge to trial counsel's performance on this issue: they manifestly failed to present readily available expert testimony that Dr. Stratbucker's methodology and determinations were wholly unreliable.

Dr. Stratbucker's methods and conclusions were simply not scientifically reliable. The district court had before it the opinion of Dr. Joseph Dyro, an internationally recognized biomedical and clinical engineering expert, in the field that would evaluate stun guns. Dr. Dyro explained:

> I do not believe there is any reliable scientific theory or technique upon which Dr. Stratbucker could base [his] conclusion...I find it very significant that Dr. Stratbucker reached his conclusions after examining crime scene photographs rather than the body itself and the actual marks on it. Essentially, he is working backwards in hypothesizing these marks were caused by a stun gun. *Nothing in the scientific literature supports this methodology...*After looking at the photographs taken at the crime scene upon which Dr. Stratbucker relied, *I do not think it is scientifically possible to conclude these marks were caused by a stun gun.* There are no regular patterns. There are varying spacings. The marks have different sizes, different shapes, and different colorations. The wide variation of the marks depicted in these photographs *makes it impossible to conclude they were caused by a stun gun. There is not a convincing set of marks to suggest a stun gun, and especially a specific stun gun was used... I do not believe there is a general acceptance in the relevant scientific community for Dr. Stratbucker's analysis and*

---

[9]Of course, the district court's assignment of motivations and non-credibility to trial counsel's affidavits is little more than assessments that can only be made after an evidentiary hearing, which it did not afford Mr. Jackson.

> *conclusions regarding the ability to examine marks on an object in a photograph and extrapolate that those marks were caused by a stun gun, and especially a specific stun gun.*

[JA 292-94] (emphasis added).[10]

With regard to the so-called "signature" marks Dr. Stratbucker identified in the crime scene photographs, Dr. Dyro noted that the marks had not been histologically examined to link the marks to electrical energy originating from a stun gun. Instead, in this case, Dr. Stratbucker simply "worked backwards from a picture to conclude" that "red spots on a body that have varying size, shapes, [and] intensity" were made by a "stun gun." [JA 295, 296] The marks Dr. Stratbucker attributed to mechanical thrusting of the stun-gun probe into the victim's body were not scientifically supportable, in part, because there are "no experiments or data in the literature that control for the known force, pressure, or speed with which a stun gun is moved across the skin." [JA 295]

---

[10]It bears noting that the district court completely ignored Dr. Dyro's analysis. It is not mentioned in the order denying the motion to vacate. [JA 2066-80] Likewise, the district court does not discuss the expert opinions of Jason Byrd, Ph.D., an accomplished forensic entomologist; Dr. Werner Spitz, a pre-eminent forensic pathologist; or John D. Butts, M.D., North Carolina's Chief Medical Examiner, who authored the autopsy report and testified for the prosecution in the state trial proceedings about discoloration and loss of superficial layers of skin due to decomposition and insect activity visible in his examination of the victim's body. [JA 2066-80]

36

Indeed, Dr. Stratbucker himself expressed a similar opinion when he testified in a case in 1994.[11] When asked if a reputable expert in the field of stun guns and stun-gun-inflicted injuries would be able to render an opinion concerning the cause of injuries based only on a review of photographs of the injuries, Dr. Stratbucker replied, "I know of no reputable expert in the field . . . who would render anything close to an unqualified causation opinion based on these photographs." [JA 1209-11, 1206] Thus, Dr. Stratbucker himself stated, seven years before he testified in Mr. Jackson's trial, that no reputable expert would render a causation opinion based on photographs. Nevertheless, Dr. Stratbucker rendered precisely such an opinion in Mr. Jackson's case based solely on his review of crime scene and autopsy photographs. The methodology Dr. Stratbucker used in reaching his opinion he gave in Mr. Jackson's trial was a technique he himself had earlier repudiated.[12]

Dr. Dyro explained the flaw in drawing a conclusion after examining crime scene photographs rather than the body itself and the actual marks. This process essentially works backward in hypothesizing the cause of the marks. "Nothing in the scientific literature supports this methodology. Indeed, from my own examination

---

[11] Through a reasonable investigation, Mr. Jackson's trial counsel could have obtained this information and used it to impeach Dr. Stratbucker. They did not, but rather let the issue of testimony about stun guns "[fall] through the cracks." [JA 382]

[12] Again, as with its avoidance of Dr. Dyro's analysis, the district court ignored Dr. Stratbucker's own repudiation of the methodology he used in Mr. Jackson's trial. [JA 2066-80]

of crime scene photographs, I cannot conclude that the marks were caused by a stun gun. The marks could have been caused by insects or a number of other events." [JA 293] Indeed, when Dr. Dyro examined the very photographs upon which Dr. Stratbucker relied, he noted, "I do not think it is scientifically possible to conclude these marks were caused by a stun gun. . . . There is not a convincing set of marks to suggest a stun gun, and especially a specific stun gun, was used." [JA 293-94] This opinion is striking. It directly contradicts the testimony of Dr. Stratbucker. Had the district court–and this Court–been furnished with this contrary opinion, certainly in tandem with Dr. Stratbucker's own disavowal of the process, it would likely have rejected the proffered testimony of Dr. Stratbucker.[13] At the very least, with this contrary evidence, the issue would have been extensively litigated at trial and on appeal.

Dr. Dyro also challenged Dr. Stratbucker's premise that stun gun marks have such unique characteristics that anyone can conclude from the marks depicted in these photographs that they were caused by a stun gun. Dr. Dyro does not believe there is general agreement or support in the relevant scientific community for the

---

[13]"Counsel have an obligation to conduct an investigation which will allow a determination of what sort of experts to consult [and then] must present those experts with information relevant to the conclusion of the expert." *Caro*, 165 F.3d at 1226; *see Dugas v. Coplan*, 428 F.3d 317, 331 (1st Cir. 2005); *Miller v. Anderson*, 255 F.3d 455, 459 (7th Cir. 2001). Mr. Jackson's counsel failed to do so, leaving the district court without this information.

conclusions Dr. Stratbucker reached in Mr. Jackson's case. [JA 294] This view flows, in part, from the dearth of studies of stun guns using human subjects.[14] Dr. Dyro believes the only such study is one conducted by Dr. Stratbucker himself. In that situation, Dr. Stratbucker used only one stun gun and applied it to the arms of twenty police officers. This single study is not a sufficient scientific basis upon which to rest conclusions regarding signature marks. [JA 294]

The study also had methodological deficiencies. Dr. Stratbucker did not control for numerous variables such as the amount of force with which the stun gun was pressed against the subject, the difference between the arms of the various subjects, the space between the electrodes of the stun gun and the skin of the subject, the movement of the stun gun across the arm of each subject, or the contact pressure of the stun gun in each situation. Dr. Dyro found only one-fourth of the subjects in this study even were left with a red mark that Dr. Stratbucker later described as a signature mark. "This result alone calls into question the legitimacy of this

---

[14] One of the criteria for determining the validity of novel scientific testimony is whether other published or reported works containing the results of any other testing support the proffered opinion. *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579, 593 (1993). No other published or reported works contain the results of any other testing of stun guns on humans. The absence of other testing and reported findings in peer review publications makes it impossible to determine whether Dr. Stratbucker's conclusions are scientifically verifiable and reliable. [JA 294] Defense counsel should have engaged an expert like Dr. Dyro who could have explained the absence of scientific validity and published studies in the area of Dr. Stratbucker's opinion.

39

experiment to support Dr. Stratbucker's premise that stun guns leave signature marks on humans."[15]  [JA 294]

Dr. Dyro also noted Dr. Stratbucker indicated he based his conclusions, at least in part, on the distance of various marks on the body depicted in the crime scene photographs.  But Dr. Dyro examined the photographs himself and found nothing in these distances to suggest the marks were caused by a stun gun.[16] Dr. Dyro also criticized Dr. Stratbucker's reliance on two-dimensional photographs. As he explained, a photograph will distort the shape of a three-dimensional object depicted in it.  Dr. Stratbucker's conclusions do not account for such distortion. Dr. Dyro does not "think it is scientifically defensible to work backwards from a picture to conclude that a set of marks in the picture were caused by a stun gun." [JA

---

[15]  Another criterion to be used in judging the admissibility of novel scientific testimony is the known error rate in the relevant testing.  Dr. Stratbucker has never introduced the concept of rate of error in any of his writings or analysis.  In other words, there is a total absence of a rate of error in his testing. [JA 295-96] Scientists characterize the variability of conclusions based upon measured error rates.  "These include errors based upon differences within the physiological system, errors of observation, and other variables.  Dr. Stratbucker has none of these potential errors included in his experiments and analysis." [JA 295-96]

[16]  Dr. Dyro personally examined marks or spots on a living person that resembled the marks on the body depicted in the autopsy photographs Dr. Stratbucker used.  The marks on the body Dr. Dyro examined could be measured in a way to find a consistency of distances like those Dr. Stratbucker found in the crime scene pictures and thus conclude those marks were also caused by stun gun.  However, the marks on the person Dr. Dyro examined were caused by insect bites, demonstrating the importance of having histological information before rendering opinions.

296] The jury in Mr. Jackson's case should have heard contrary testimony regarding Dr. Stratbucker's methodology and analysis.

Finally, Dr. Dyro found no support in the biomedical engineering literature for Dr. Stratbucker's conclusions. Based upon his training and experience in biomedical engineering, Dr. Dyro does not believe "there is a generally acceptance in the relevant scientific community for Dr. Stratbucker's analysis and conclusions regarding the ability to examine marks on an object in a photograph and extrapolate that those marks were caused by a stun gun, and especially a specific stun gun."[17] [JA 296]

This information, particularly the specific criticism of Dr. Stratbucker's methodology and conclusions by Dr. Dyro, casts grave doubt on the reliability of the testimony Dr. Stratbucker gave in Mr. Jackson's trial. If Dr. Dyro had been retained by defense counsel and called as a witness to challenge to Dr. Stratbucker's proposed testimony, it is likely this prejudicial testimony would have been excluded. At the very least, the jury would have heard Dr. Dyro's opinions regarding the absence of a general acceptance of Dr. Stratbucker's methodology in the relevant scientific community, Dr. Stratbucker's lack of training and experience in the relevant scientific field, Dr. Dyro's specific criticisms of the methodology and process used

---

[17]    Indeed, Dr. Stratbucker himself later expressed this same view that no competent expert would base an opinion solely upon photographs. Nevertheless, he did so in this case.

41

by Dr. Stratbucker to reach his conclusions, and Dr. Dyro's contrary analysis of the crime scene photographs. If the jury had heard how Dr. Stratbucker reached his conclusions without any histological information and learned of the flaws in his methodology and theory, it would not have attached much, if any, significance to his opinions, even assuming the district court would have permitted him to testify. This result is especially likely if the jury had been presented with Dr. Stratbucker's own opinion expressed in 1994 that no credible expert would render an opinion as to causation of injuries based solely upon photographs. [JA 1206, 1209-11]

Mr. Jackson also presented further expert analysis. Jason Byrd, Ph.D., an accomplished forensic entomologist, reviewed the crime scene photographs and the autopsy report. He noted:

> I noticed some tissue discoloration and numerous marks in the decedent's pubic area, as well as on each side of the victim in the area near the top of the Innominate bone. These are consistent with insect feeding artifacts. The circular defects on the victim's sides are characteristic of ant scavenging. These areas can become greatly enlarged, but at early onset they are most commonly circular in nature. The area of discoloration and tissue change above the pubic arch is consistent with the feeding pattern of fly larvae, and this type of artifact is extremely common on humans and animals. I did not notice anything inconsistent with the natural process of insects colonizing a corpse.

[JA 2293] Dr. Byrd found Dr. Stratbucker's assertion that there were stun-gun marks apparent in the photographs "incorrect" and saw nothing in the photos that showed

"injuries inconsistent with the normal feeding of insects and larvae that occurs when a body decomposes." [JA 2294]

In addition, Dr. Werner Spitz, a pre-eminent forensic pathologist,[18] found, as did Dr. Dyro, Dr. Stratbucker's conclusion regarding the alleged "stun gun" marks in the photographs "unreliable" and lacking scientific foundation. [JA 2264] He also found the conclusion "misleading and implausible," and Dr. Stratbucker's claim that the marks could not have come from any other source "simply false." [JA 2264] Based on his experience conducting autopsies, Dr. Spitz noted the "wounds Dr. Stratbucker identified and attributed to a 'stun gun' *were caused by typical post-mortem insect activity.*" [JA 2264-65] (emphasis added). He explained "[s]uch insect activity would have occurred where, as in this case, the victim's body was exposed to natural elements of a forest ecosystem for weeks before being discovered. Maggots from flies would cause such lesions as would beetles, ants, or numerous other species of insects . . . ." [JA 2265] The "signature" marks identified by Dr. Stratbucker in the photographs were, according to Dr. Spitz, based on a "highly questionable, scientifically indefensible method" [JA 2264-65], in light of the evidence pointing to post-mortem insect activity. Dr. Spitz further noted that the

---

[18] Dr. Spitz is co-author of MEDICOLEGAL INVESTIGATION OF DEATH: GUIDELINES FOR THE APPLICATION OF PATHOLOGY TO CRIME INVESTIGATION (Werner U. Spitz et al. eds., 1973, 1980, 1993, 2006), a widely-used textbook oriented to forensic pathology and criminal investigation.

43

marks Dr. Stratbucker alleged came from mechanical thrusting "would have resulted in distinguishable, abnormal markings that contain hemorrhaging and central puncture wounds that penetrate beyond the epidermis." [JA 2264-65] Dr. Spitz pointed out "the photographs reveal nothing more than superficial lesions that do not penetrate beyond the epidermis." [JA 2264-65]

Dr. Spitz also cited to the autopsy report and highlighted that the pathologist conducting the autopsy, not Dr. Stratbucker, was in the best position to see hemorrhaging or central puncture wounds on the victim's body. As Dr. Spitz opined: "it is of unparalleled significance that the author(s) of this Autopsy Report...notably did not note abnormal markings...that would be apparent from the application of a 'stun gun.'" [JA 2264] Indeed, John D. Butts, M.D., Chief Medical Examiner for the State of North Carolina, who authored the autopsy report, was questioned before the state trial about whether the wounds on the victim's body could have been caused by a stun gun. [JA 2291] Dr. Butts said "nothing on the victim's body in regard to the wounds in question . . .was inconsistent with the natural process of decomposition and insect colonization of a corpse." [JA 2291] During the autopsy, he "observed multiple injuries on the decedent's body that were *definitely caused by insect feeding*," and "*did not observe any other patterned injuries, hemorrhages, or other wounds . . .*" [JA 2291] (emphasis added). Had he noticed such injuries, he would have included them in his report. [JA 2291]

44

Dr. Stratbucker's opinion that Mr. Jackson tortured the victim with a stun gun, based solely on crime scene photographs, is untenable in light of accepted scientific scrutiny.[19]  He provided the jury with a highly salacious but scientifically unreliable account of the injuries on the victim while ignoring or failing to account for the obvious explanation that the marks he identified in the photographs were in fact caused by insects.

The district court found trial counsel's failure to investigate and present evidence challenging the government's stun-gun theory did not constitute deficient performance because counsel did not ignore the issue of the stun gun, but rather made an effort to present a defense.  [JA 2066-68]  The order summarily rejected trial counsel's own admission of deficient performance as "distorted and incorrect," and noted that trial counsel requested numerous experts, including several whom the district court refused to appoint and fund.  [JA 2067]  But the denial of this claim focused primarily upon its determination that "the fact that the [district court] denied counsel's request for [forensic anthropologist] Dr. Marks and subsequently [forensic pathologist] Dr. Hurt is not ineffective assistance of counsel."  [JA 2070]  However,

---

[19]  This Court should be disturbed, if not appalled, by the government's use of such an unreliable and unqualified witness to secure a conviction and death sentence. When it found the district court did not abuse its discretion in admitting this testimony at trial, it had no knowledge of this unreliability and lack of qualifications shown by Drs. Dyro, Spitz, Butts, and Byrd, as well as Dr. Stratbucker's own rejection of this methodology.

45

this analysis failed to recognize the scope and effect of trial counsel's omissions. Merely because the district court denied appointments of pretrial experts related to the stun-gun evidence does not mean counsel's pretrial preparation was effective, relieve counsel of the obligation to find and present competent expert testimony on a critical issue, or excuse the district court from further scrutiny of their actions.[20]

Trial counsel's omissions were glaring. First, they did not speak with Dr. Butts, who has been subpoenaed by the government and came to the trial [JA 2291], although he did not testify because the defense conceded cause of death. Had trial counsel spoken to Dr. Butts, they would have learned he "saw nothing on the victim's body in regard to the wounds in question that was inconsistent with the natural process of decomposition and insect colonization of a corpse." [JA 2291] He also "did not observe any other patterned injuries, hemorrhages, or other wounds aside from a gunshot wound tot he decedent's head." [JA 2291] This critical evidence would have potentially prevented the admission of Dr. Stratbucker's testimony altogether or at least have provided dramatic contradiction. It was at counsel's

---

[20]Again, the district court truncated the requirement of section 2255 that an evidentiary hearing is required unless the record conclusively shows Mr. Jackson is not entitled to relief on this issue. Rather than conclusively showing Mr. Jackson is not entitled to relief based on trial counsel's ineffective handling of the stun gun matter, the material submitted in support of the motion to vacate, taken in a light most favorable to Mr. Jackson, entitled him to relief on this issue. The uncontradicted evidence showed the government's expert was unreliable and there was substantial, compelling contrary expert testimony trial counsel should have been presented.

46

fingertips; they simply failed to reach for it. Second, even absent funding from the district court, trial counsel could have located and consulted with experts who would have established that Dr. Stratbucker's methods and conclusions were suspect at best (as well as demonstrated the need for adequate resources). Despite being denied virtually every request for resources to obtain experts to investigate and prove his claims, Mr. Jackson has located several world-renowned experts who have–to the extent possible without adequate funding–reviewed pertinent records in the case and decried the unreliable trial testimony of Dr. Stratbucker. [JA 291-96, 2262-94] The information in these experts' opinions was available to trial counsel as well, had they properly investigated. Counsel cannot make an informed and reasonable decision about trial strategy without doing a full and complete investigation. *Wiggins v. Smith*, 539 U.S. 510, 526-27 (2003); *Alcala v. Woodford*, 334 F.3d 862, 871 (9th Cir. 2003); *United States v. Gray*, 878 F.2d 702, 711 (3d Cir. 1989).

The prejudice from trial counsel's failure to challenge the testimony of Dr. Stratbucker can hardly be overstated. It provided critically damaging testimony about premeditation and deliberation as well as the heinousness of the crime. Dr. Stratbucker's testimony provided the government a method of presenting "scientific" proof that the victim was not just murdered but brutally tortured. He provided the crucial "expert" link that allowed the prosecutor to argue to the jury in closing that Mr. Jackson tortured the victim with "glee," while he was "digging in to her with that

47

stun gun . . . enjoying what he was doing." He argued that there was "no question she was tortured. She was tortured." (Tpp. 1455, 1481) The prejudicial aspect of this evidence is beyond cavil. "In a capital case, the specious testimony of [expert testimony], colored in the eyes of an impressionable jury by the inevitable untouchability of a medical specialist's words, equates with death itself." *Barefoot v. Estelle*, 463 U.S. 880, 916 (1983) (Blackmun, J., dissenting). Effectively unchallenged, Dr. Stratbucker appeared before the jury as a man of science. After describing to the jury a "study" he conducted in which he applied one particular "stun gun" to the arms of twenty police officers, and in which only a quarter of those police officers exhibited red marks resulting from the "stun gun" that Dr. Stratbucker labeled "signature"[21] (Tpp. 1079-80), he pointed to various sets of "signature" marks on the victim's body based on crime scene photographs. (Tp. 1089) Pointing to a number of marks that did not fit into his definition of "signature" marks, Dr. Stratbucker claimed the marks still had the "dimensionality of a stun gun probe" and he opined Mr. Jackson must have mechanically thrust the stun gun into the victim "like a dagger digging holes into the skin."[22] (Tp. 1091)

---

[21] Trial counsel could have offered evidence to discredit Dr. Stratbucker's reliance on this sole study, such as Dr. Dyro noting Dr. Stratbucker's study "was not a sufficient scientific basis upon which to base his conclusions regarding signature marks." [JA 294]

[22] According to Dr. Dyro, these assertions are untrue and without scientific support.

Mr. Jackson has developed strong and compelling expert opinions showing Dr. Stratbucker's testimony was grossly misleading. Yet his trial lawyers did not obtain and use this readily available evidence. Trial counsel learned from Dr. Murray the marks were more likely caused by insects. But the follow-up discussions with Dr. Marks dealt only with time and place of death. Dr. Marks referred counsel to Dr. Byrd, the forensic entomologist with expertise in estimating "the time of death scientifically based on the presence of insects on a decomposing body." [JA 302-03] Competent counsel would have told Dr. Byrd about the allegation involving a stun gun. But, as Dr. Byrd put it, they "never mentioned a 'stun gun' and never asked whether I believed the marks could have been made by such a weapon." [JA 2293] If they asked, he would have said "[n]othing in the photos shows injuries inconsistent with the normal feeding of adult insects and larvae that occurs when a body decomposes." [JA 2293] He would have also offered his opinion that any assertion about marks attributable to a stun gun was incorrect. [JA 2293]

The only additional step they took was delegating the search of an expert to Mr. Lindsay's legal assistant. [JA 381-82] Despite obvious areas of expertise available to debunk Dr. Stratbucker's "junk science," including forensic pathology, entomology, and biomedical engineering, counsel mustered only Robert Siciliano, a "keynote inspirational speaker" with training as a bodyguard and a bouncer. [JA 381-82, 1278-87] The significance of counsel asking the district court to appoint Siciliano

49

for the *Strickland* analysis was not that it was denied, but that it showed counsel took only pathetic steps to mount an effective challenge to the stun-gun allegations.[23]

Reasonably competent counsel surely would have contacted Dr. Butts, who did the autopsy, to learn what, if any, evidence there was of stun-gun injuries. Dr. Butts would have told them he observed no "patterned injuries, hemorrhages, or other wounds" from a "stun gun." [JA 2291] He routinely saw insect colonization on human bodies and described the state of the victim's body in that way. He would also have testified to the same. [JA 2291]

Mr. Jackson grounded this claim of ineffectiveness not on the in-court arguments about the reliability of the stun-gun evidence, but on trial counsel's failure to develop relevant expert evidence–evidence the district court and, more importantly, this Court, did not know when it approved Dr. Stratbucker's testimony. Trial counsel's deficient performance stemmed from the lack of investigation and the unreasonable reliance on cross-examination in the midst of readily available,

---

[23]The district court somewhat cavalierly noted it could not be ineffective assistance to obtain and use an incompetent expert, referring to Siciliano. [JA 2070] While an accurate statement, it wholly misses the mark of the claim. Trial counsel completely botched the matter of stun-gun evidence, from contacting a person not remotely qualified to deal with the subject, to mismanaging the discussions they had with the experts who could shed light on the issue (Dr. Marks, Dr. Byrd, Dr. Butts), to not locating experts in the relevant fields who could have virtually destroyed the government's evidence (Dr. Dyro and Dr. Spitz). Trial counsel contacted a motivational speaker, not an expert in the relevant scientific arenas. The district court's rejection of this claim is indefensible.

substantive, and expert evidence from Dr. Dyro, Dr. Butts, Dr. Byrd, Dr. Spitz, and others, which would have fully undermined Dr. Stratbucker's conclusions by proving his "findings" false. Indeed, it likely would have rendered Dr. Stratbucker's testimony inadmissible.

When the district court admitted the stun-gun evidence at trial, it found "overwhelming evidence of expertise and *total lack of contrary evidence* to cast doubt upon the reliability or quality of Dr. Stratbucker's training, experience, knowledge gained from a variety of experiments performed and the available literature." [JA 1295-98] (emphasis added). Trial counsel failed to provide the district court with contrary evidence despite the existence of a wealth of readily available evidence to cast doubt on Dr. Stratbucker's qualifications, his methods, and his conclusion that the victim was tortured with a stun gun, including his own rejection of the methodology. Based on this ineffective assistance, the denial of the motion to vacate must be reversed.

**III.** **THE DISTRICT COURT ERRONEOUSLY DENIED THE MOTION TO VACATE WHERE TRIAL COUNSEL RENDERED INEFFECTIVE ASSISTANCE IN FAILING TO PROVIDE THE EXPERT LINK BETWEEN RICHARD JACKSON AND HIS SEVERELY IMPAIRED BIOLOGICAL SISTER ABOUT WHOM COMPELLING MITIGATING EVIDENCE COULD HAVE BEEN PRESENTED.**

**Standard of Review**: This Court reviews the denial of a motion to vacate where no hearing was held by taking the evidence in the light most favorable to the

movant. *United States v. Poindexter*, 492 F.3d 263, 267 (4ᵗʰ Cir. 2007). A district court's determination of legal questions is reviewed de novo. *United States v. Stitt*, 552 F.3d 345, 350 (4ᵗʰ Cir. 2008), *cert. denied*, 130 S. Ct. 65 (2009).

**Discussion**: During the course of their investigation, trial counsel learned Mr. Jackson's biological sister, Wilma, who had been adopted by Phillip and Alice Allen, had significant emotional and behavioral problems. Phillip Allen described these conditions in detail and noted many of the problems Wilma had were biological and genetic. [JA 242-46] This information concerning Mr. Jackson's biological sister was critical information for the jury's consideration as to his sentence.

At the sentencing hearing, the government indicated the defense planned to offer the testimony of the Allens concerning their adopted daughter, Wilma, Mr. Jackson's biological sister, and their other adopted daughter, his niece. The prosecutor moved to prohibit this evidence "without some foundation showing [of] a [biological] connection." (Tp. 1378)

In response, defense counsel proffered that the "information [concerning Mr. Jackson's biological sister] is relevant at this point in that you have a biological sibling in a home separate and apart from this Defendant, a home that was very similar in many ways to the Jackson family, a middle to upper income level family, that they tried and gave love and care and attention to that child as well, and despite

52

their valiant efforts, that child now is in a 24-hour care facility with significant emotional problems." (Tp. 1379) However, when the district court asked if Mr. Jackson could offer testimony from an expert witness as to "some relationship between this [information concerning Mr. Jackson's biological sister] and tie it to this Defendant," trial counsel indicated this expert testimony was available but "in light of our notice that we were not going to be offering any expert mental health testimony, we have none at this point." (Tp. 1379) The district court granted the government's motion to exclude testimony from the Allens. After the district court's ruling, defense counsel made an additional proffer as to the testimony the Allens would give. (Tpp. 1380-82)

Trial counsel's failure to argue a more expansive theory of admissibility of this compelling evidence and to proffer expert testimony to establish the necessary connection was the product of poor preparation, a misunderstanding of the law, and an unfounded fear that any expert testimony showing the connection of a genetic medical condition between Mr. Jackson and his biological sister would open the door to rebuttal from government's mental health experts. *See Lindstadt v. Keane*, 239 F.3d 191 (2d Cir. 2001) (counsel failed to offer adequate arguments for relevance of defense testimony). Trial counsel's reaction to the government's motion demonstrates they did not anticipate a relevance challenge to the admissibility of the

53

evidence.  Moreover, the  cursory nature of the proffer shows trial counsel did not understand the full scope of what the Allens could explain and the strong biological and genetic link between Wilma's conditions and Mr. Jackson's problems.

Ms. Allen related to the defense mitigation investigator significant information about Wilma's behavior.

> Wilma's adoptive mother reported that she saw signs of autistic behavior in her daughter within a few weeks after the placement.  The child was over-excitable and demanding.  She exhibited inappropriate laughing and seemed withdrawn into herself, often talking to her hands and avoiding eye contact with others.  She was especially resistant to attention by women.  She displayed rigid posturing when touched or hugged.  The child was highly resistant to any environmental change.  As she began school, the mother noticed that she was not a social child and preferred solitary activity when other children were around.  Although the parents described these behaviors to their physician, they were told that the child was fine and would outgrow them.  As Wilma got older, her problems actually worsened.  She became sexually promiscuous during adolescence and began having dramatic mood swings.  She became hostile toward her parents and resistant to their attempts to control her behavior.  She dropped out of school in the eleventh grade. Psychiatric care was sought and Wilma was diagnosed with Bipolar Disorder.  Over the course of later adolescence and early adulthood she was psychiatrically hospitalized on several occasions.  The adoptive mother reported that Wilma was especially hostile toward her around ages nineteen to twenty, and repeatedly threatened to harm the mother.  On one occasion, a psychiatrist at the mental hospital told the mother that he viewed Wilma as homicidal.  Wilma's behavior remained out of control into adulthood and she continued to have significant problems with alternating moods.  A few years ago she was finally diagnosed as having Asperger's Disorder, an autistic disorder, in addition to bipolar illness.  Wilma currently resides in a care facility where her behavior and mood have substantially improved due to

appropriate treatment….Nevertheless, the mother also reported that the pervasiveness of Wilma's social and cognitive limitations due to the autistic disorder preclude independent living for Wilma.

[JA 1413-14]

In response to the district court's inquiry, Dr. Coleman could have easily provided the connection between Wilma's developmental disorders and other mental health conditions and the characteristics of Mr. Jackson. [JA 276-77] She noted, "I would have been able to provide testimony of such a link for the court." [JA 277] She had included this linkage in her report to trial counsel. When she reviewed Mr. Jackson's "history of behavioral and psychological problems throughout his life" and Wilma's "developmental problems and psychiatric problems," Dr. Coleman found them "possibly diagnostically significant." [JA 1413-15] As Dr. Coleman put it, "Given that the incidence of both bipolar disorder and autistic disorder or symptoms is increased in a sibling of a child having them, the problems of Mr. Jackson's biological sister appear relevant to his own diagnosis." [JA 1414] Dr. Coleman further explained the diagnostic significance of Wilma's disorders:

> While the full range of typically severe social and attentional dysfunction characteristics of autism was not present, there appears to have been behavior consistent with subthreshold symptomology. Such partial behavioral patterns are more likely in individuals who have siblings diagnosed with an autism spectrum disorder, such Mr. Jackson's sister, Wilma. It is also noteworthy that there is a growing body of evidence that Bipolar Disorder exists in even young children and can account for irritability, temper tantrums, impulsivity, hyperexcitement and excessive preoccupations. Lastly, the fact that Mr. Jackson's

55

biological sister has an autistic disorder coupled with a mood disorder is also supportive of these diagnostic possibilities since both disorders have familial links. All of these factors suggest that mood disturbance and a developmental disorder such as atypical autism might have accounted for Mr. Jackson's range of symptoms from an early age.

[JA 1415-16] In short, an expert, who had provided a report to defense counsel before the sentencing hearing, could have tied Wilma's developmental disorders and other mental health conditions to Mr. Jackson's own mental problems.[24] For counsel not to proffer Dr. Coleman's testimony was unreasonable and fell below the standard of care required of counsel.

When the district court asked for the proffer of an expert linkage between Mr. Jackson and Wilma, defense counsel demurred in view of its agreement not to present expert testimony regarding Mr. Jackson's mental condition. But trial counsel have acknowledged they never considered making a proffer of this expert testimony to the district court pursuant to Fed. R. Evid. 104. Rule 104(a) provides that "[p]reliminary questions concerning the qualifications of a person to be a witness, the existence of a privilege, or the admissibility of the evidence shall be determined by the court." Fed. R. Evid. 104(a). Rule 104(c) provides that a hearing on a preliminary matter,

---

[24] Defense counsel also could have established the connection between Mr. Jackson and his sister's biological afflictions by proffering evidence from the literature, which would have allowed the judge and jury to infer a link between Wilma's mental, emotional and behavioral disturbances and Mr. Jackson. Although Dr. Laughon was not asked to testify at the sentencing hearing, she is a licensed psychologist and could have, based on her understanding of the literature, testified to establish the link required by the district court.

such as the expert linkage required in this situation, can be conducted out of the hearing of the jury. Fed. R. Evid. 104(c). Trial counsel could have made the necessary proffer to the district court that would have allowed the admission of this important evidence without actually presenting expert testimony to the jury. Their failure to make this proffer pursuant to Rule 104, thereby losing the benefit of the compelling testimony about Wilma from Phillip and Alice Allen, was constitutionally deficient.

Donald H. Beskind, a seasoned civil trial lawyer and evidence professor, explained that competent counsel should have known they could establish this link through evidence presented only to the court. [JA 266] In his opinion, the link could have been made in this manner and counsel acted deficiently in failing to do so.

This unacceptable performance by defense counsel prevented the jury from hearing important mitigating evidence. Similarities between Wilma's physical, mental, and emotional conditions and those of Richard Jackson were quite significant. Had the jury heard testimony from the Allens, they would have understood Mr. Jackson suffered from both a biological condition and an environmental background that caused him to act and behave in utterly unacceptable ways. This testimony would not have constituted expert opinion as to Mr. Jackson's mental and emotional conditions. This compelling evidence would have allowed the jury to consider various aspects of Mr. Jackson's background and character that could have

57

lead to a sentence less than death. This proffered mitigating evidence would have supported two statutory mitigating factors: (1) that Mr. Jackson's capacity to conform his behavior to the requirements of the law was significantly impaired, and (2) that Mr. Jackson suffered from a severe mental or emotional disturbance. *See* 18 U.S.C. § 3592(a)(1) & (6). Without the benefit of this testimony, not a single juror found either statutory mitigating circumstance in this case. [JA 1311] Likewise, testimony from the Allens would have supported the mitigating nature of several other non-statutory circumstances submitted for consideration. These included Mr. Jackson spending his first five and one-half years in the custody of social services, his being in eight different foster homes, his inappropriate sexual behavior, his attempted suicides, his addiction to pornography, and his general mental health problems. In his penalty phase closing argument, the prosecutor urged the jury to reject these mitigating circumstances because the only evidence supporting them came from Sally Jackson or defendant himself. (Tp. 1461) As with the two statutory mitigating factors, virtually no jurors found any of these non-statutory mitigating circumstances that would have been supported by testimony from the Allens. [JA 1311-15] Thus, this constitutionally deficient performance was not harmless. The error regarding mitigation was prejudicial because there is "a reasonable probability that at least one juror would have struck a different balance" at sentencing. *Wiggins*

58

*v. Smith*, 539 U.S. 510, 537 (2003).  Accordingly, the district court erred in denying

the motion to vacate.

**IV.    THE DISTRICT COURT ERRED IN DENYING THE MOTION TO VACATE DUE TO INEFFECTIVE ASSISTANCE OF COUNSEL IN FAILING TO PRESENT AVAILABLE MITIGATING EVIDENCE THAT COULD HAVE LED ONE JUROR TO RETURN A LIFE SENTENCE.**

**Standard of Review**: This Court reviews the denial of a motion to vacate

where no hearing was held by taking the evidence in the light most favorable to the

movant.  *United States v. Poindexter*, 492 F.3d 263, 267 (4th Cir. 2007).  A district

court's determination of legal questions is reviewed de novo.  *United States v. Stitt*,

552 F.3d 345, 350 (4th Cir. 2008), *cert. denied*, 130 S. Ct. 65 (2009).

**Discussion**: A lawyer must provide effective assistance to his client.  "In

evaluating an ineffective assistance claim, a court 'must judge the reasonableness of

counsel's challenged conduct on the facts of the particular case, viewed at the time

of counsel's conduct.'"  *Gray v. Branker*, 529 F.3d 220, 229 (4th Cir. 2008) (quoting

*Strickland v. Washington*, 466 U.S. 688, 690 (1984)). Here, trial counsel opted to

present only one witness in mitigation: Sally Jackson.  Trial counsel did not offer a

plethora of supporting witnesses, all of whom would testify consistent with the

defense theory in mitigation.  It was unreasonable not to introduce this other evidence

as it allowed the prosecutor to argue nothing supported the mitigation except Sally

Jackson, who was trying to help her adopted son.  Under these circumstances, the

59

performance was deficient and it prejudiced Mr. Jackson. *Wiggins v. Smith*, 539 U.S. 510, 537 (2003); *Williams v. Taylor*, 529 U.S. 362, 390-99 (2000).

First, Mr. Jackson's adopted brother, Jamie, grew up with him and could have provided compelling testimony. Although counsel talked to Jamie, they failed to conduct a thorough mitigation interview and did not consider him a potential sentencing phase witness. Jamie knew the difficulties Mr. Jackson had as a small child and a young adult. On the first day he was in their house, Mr. Jackson, who was just over five years old, sat in the den saying, "I'm going to love you all." Over time, Jamie could see the problems with his brother. [JA 269] He played more with younger children. He was more of a loner and seemed more interested in make-believe games than sports. As he got older, his behavior toward his parents was more aggressive. He made things difficult and tense at times. [JA 269-70]

Additional mitigating information was available from Mr. Jackson's extended adopted family. They could have provided defense counsel with significant information concerning his difficulties as a child and young adult, information that would have been important to the jury.

Helen Marlowe, a paternal aunt, was eager to testify. Until the day of the sentencing hearing, she believed she would testify. She would have been an important mitigation witness as she spent a great deal of time with Mr. Jackson as he grew up. In addition, she worked with him at the Mountain View restaurant shortly

before the crime. [JA 390-91] She could have presented a compelling, mercy-evoking picture of him as a small child, worried that he would be taken out of his new home. She recalled coming to her brother's house the day Mr. Jackson arrived. She rang the doorbell and went in the house, only to learn Mr. Jackson had hidden under a bed. He was worried DSS had come to move him to a new home. [JA 390]

Her husband, Richard Marlowe, spent holidays with his nephew. He remembered there was something different about him. As he recalled, Mr. Jackson was a nervous and anxiety-ridden child. Mr. Marlowe could have told the jury about Mr. Jackson standing off to himself waving his arms up and down when he got too anxious and too excited. [JA 397]

Rebecca Taylor, another paternal aunt, knew Mr. Jackson growing up and working at the Mountain View Restaurant. She always thought there was something different about him and she discussed his difficulties with her sisters. She also noticed that he was a nervous child, easily scared; he seemed to worry he would be taken away again. She also could have told the jury that Richard's behavior when he was nervous or excited was very different from the other children she knew. He would jerk his hands around when he was scared, nervous or surprised. [JA 427]

Trial counsel never contacted her. [JA 428] She could have testified about him being scared and pitiful as a child. She could have described how his wife, Donna, constantly put him down and criticized him. [JA 427] She could also have told the

61

jury he had severely burned his arm around the time of the crime and was not able to use it well. [JA 428]

Mr. Jackson's cousin, Michael Marlowe, who is about seven years younger, could have related his memories of Mr. Jackson as a young child. When he would come to stay over at their house, he stayed in Michael's room. He would get nervous and physically sick about his parents being away. He would be huddled over the commode. [JA 394] Trial counsel never spoke with Michael Marlowe. [JA 394]

These were touching stories of a child wracked by anxiety, atypical behavior, mood swings that continued through adolescence and into adulthood. This information would have moved the jury and supported a number of mitigating circumstances. If defense counsel had conducted a thorough mitigating investigation, they would have been able to submit additional mitigating circumstances.

Defense counsel failed to present all available evidence concerning these submitted mitigating circumstances. Although defense counsel had secured records that would have supported many mitigating circumstances and corroborated the limited testimony of Sally Jackson, they failed to introduce them for the jury's consideration. In addition, there were numerous lay witnesses who could have provided the jury with compelling, mercy-evoking evidence as to Mr. Jackson's mental health problems in adolescence and his early adulthood.

62

He attempted suicide several times in high school. After two attempts while in the public schools, his adopted parents sent him to a military school in Virginia. He was not at the school for very long before he had attempted suicide again. At the time of this suicide attempt, he was hospitalized for two months due to his mental health problems. [JA 359-60, 1508-09] Defense counsel had the records from the school and from his hospitalization at the University of Virginia. They failed to introduce these records and did not pursue the leads resulting from these records. *See Rompilla v. Beard*, 545 U.S. 374 (2005). These records would have supported several mitigating circumstances. The failure to introduce these records was unreasonable as it left the jury with almost no mitigation evidence.

Other witnesses were available to testify about his mood swings and struggles with depression. [JA 268-70, 389-98, 425-29] Defense counsel could have presented additional mitigating information that would have corroborated the testimony of Sally Jackson and further strengthened the evidence presented to the jury as to the submitted mitigating circumstances. The available mitigation evidence that could have been presented would have supported the following statutory and non-statutory mitigating circumstances that were not found by any jurors: (D) (Other factors in the defendant's background, record, or character or any other circumstance of the offense that mitigate against imposition of the death sentence); (B) (During his first five and one half years of life, Richard was in eight foster care homes. During that time, he

63

was physically abused....); (G) (So much damage was done to Richard psychologically and physically before the age of five and a half years that the love and support of Sally and J.D. Jackson could not repair that damage.); (H) As early as the age of twelve and continuing throughout his life, Richard Jackson attempted suicide on many occasions by taking overdoses of medication.). [JA 1311-13]

Defense counsel made no attempt to introduce documentary evidence supporting the submitted mitigating circumstances, despite its positive tendency to corroborate the scant testimony from Sally Jackson regarding her son's experience in foster care, his emotional and development difficulties while he was growing up, and his problems as an adolescent and young adult. [JA 1319-77, 1418-53] This failure was objectively unreasonable. *See*, *e.g.*, *Hart v. Gomez*, 174 F.3d 1067, 1070-71 (9th Cir. 1999) (trial counsel ineffective for failing to present documentary evidence corroborating witness's testimony); *Cunningham v. Zant*, 928 F.2d 1006, 1018 (11th Cir. 1991) (trial counsel ineffective in failing, inter alia, "to substantiate the existence of [petitioner's head injury] or its effects on [petitioner] by introducing [petitioner's medical records . . . .").

There could be no strategic reason to refrain from introducing records establishing facts that clearly supported the mitigating factors the defense submitted. Defense counsel's failure to introduce readily-available documentary evidence that corroborated the testimony of Sally Jackson provided the government with the

opportunity to denigrate the value of her testimony in closing argument. Defense counsel's failure to introduce readily available documentary evidence regarding events about which Sally Jackson had no first-hand knowledge plainly harmed Mr. Jackson's case in mitigation. Without such documents, the jury had no information upon which it could base a finding as to these mitigating factors.

The failure to submit this documentary proof and additional evidence was clearly prejudicial. Had counsel presented such information, there is a reasonable likelihood that the jury would have found one or more of the relevant mitigating circumstances. One juror could have been persuaded to return a life sentence. Under these circumstances, the district court erred in rejecting this claim without holding an evidentiary hearing.

**V.    THE DISTRICT COURT ERRONEOUSLY DENIED THE MOTION TO VACATE BASED ON DOUBLE JEOPARDY WHERE THE STATE COURT HAD PREVIOUSLY PROSECUTED AND PUNISHED RICHARD JACKSON FOR THE SAME CRIMES AND ACTS.**

**Standard of Review**: This Court reviews de novo a district court's denial of a motion to vacate based on the determination of a legal question. *United States v. Stitt*, 552 F.3d 345, 350 (4th Cir. 2008), *cert. denied*, 130 S. Ct. 65 (2009).

**Discussion**:  The Fifth Amendment plainly states, "nor shall any person be subject for the same offense to be twice put in jeopardy of life or limb." U.S. Const., amend. V. This "text" of the Double Jeopardy Clause "is clear" and "plainly says all

65

that needs to be said." *See Maryland v. Craig*, 497 U.S. 836, 861 (1990).  Yet Richard Jackson was twice put in jeopardy of his life and punished for the same offense:  the killing, kidnaping, and sexual assault of Karen Styles.  Both the district court and this Court rejected this constitutional claim, the latter suggesting its hands were tied by "existing precedents." *Jackson*, 327 F.3d at 295.  The dual sovereignty doctrine is at odds with the original meaning and clear text of the Constitution, is no longer necessary to protect federal interest in prosecutions for matters that have historically been left to the states, and should be reconsidered.

After police found Karen Styles body in the Pisgah National Forest, Mr. Jackson was convicted in state court of her murder, rape, and kidnapping.  After the conviction was reversed, the state offered a plea bargain that he reluctantly accepted because he, his family, and his attorneys all believed this plea in state court would end all prosecution of this matter.  He received consecutive terms of imprisonment totaling a maximum of 31 years, 7 months.  Eight months later and more than six years after the crimes, the federal government indicted him on these same charges.

At no time during the first state pretrial, trial, and appellate proceedings did the federal government indicate an interest in prosecuting this case.  State and federal prosecutors met to develop a "strategy for proceeding" after Mr. Jackson was identified as a suspect.  The federal government decided to defer to the state because the primary investigators were state and county law enforcement officers.  The federal

government only decided to initiate its prosecution after Mr. Jackson successfully appealed his first state conviction and subsequently pled guilty.

These facts call into question the dual sovereignty doctrine. Historically, an acquittal in state court does not bar prosecution in federal court arising out of the same acts. *See Abbate v. United States*, 359 U.S. 187 (1959); *see also United States v. Lanza*, 260 U.S. 377 (1922); *accord Bartkus v. Illinois*, 359 U.S. 121 (1959) (acquittal in federal court not bar subsequent state prosecution). However, under the original meaning of the double jeopardy clause, the disposition in one jurisdiction could be pleaded as a defense in another jurisdiction. Because the dual sovereignty doctrine is in direct conflict with the original meaning of double jeopardy, it should not be followed unless mandated. A resort to first principles is appropriate both given the extreme facts of this case and the ever-expanding reach of federal criminal law.

The federal government had a legitimate interest in keeping the national forest safe. However, this interest was vindicated through the two state-court proceedings. The federal government intentionally deferred to the state prosecutors. Following a plea offer by the state, Mr. Jackson pled guilty and received substantial sentence of over thirty years in prison. Then, more than six years after the crime, and in

67

contradiction of the explicit directives of its own *Petite* policy, the government obtained its indictment in this case.[25]

In cases of concurrent jurisdiction over forest lands, state and federal governments share an identical interest: protecting visitors to these lands. In this case, the state sufficiently vindicated this interest through the convictions for murder, rape, and kidnaping and the resulting long prison sentences for which parole was not available. The dual sovereignty doctrine emerged in *Lanza*, which relied on the notion that double jeopardy limited only the federal government because the Fifth Amendment had not been applied to the states. *Abbate* and *Bartkus* simply followed the earlier decisions like *Lanza*. But ten years after *Abbate* and *Bartkus*, however, double jeopardy was applied to the states. *See Benton v. Maryland*, 395 U.S. 784 (1969). *Benton* casts extreme doubt on the continued validity of dual sovereignty. Although dual sovereignty doctrine does not bar successive state prosecutions, *see Heath v. Alabama*, 474 U.S. 82 (1985) (relying on different crimes committed in each jurisdiction), it has not been addressed directly in the context of the state-federal prosecutions after *Benton*.

---

[25] The Department of Justice has long recognized that successive prosecutions place unreasonable burdens on persons accused of crimes that violate state and federal laws. The express purpose of the *Petite* policy is to "protect person charged with criminal conduct from the burdens associated with multiple prosecutions and punishments for substantially the same act(s) or transaction(s) …." U.S. Attorney's Manual, Section 9-2.031(A).

Since its early application in *Lanza*, dual sovereignty has received significant criticism. "The legal logic used to prove one thing to be two [the same crime to be different crimes] is too subtle for me to grasp." *Abbate*, 359 U.S. at 202 (Black, J., dissenting). Much of the criticism surrounds the inherent weakness of this doctrine when examined with an eye toward the original meaning of the Double Jeopardy Clause. Dual sovereignty is simply unfaithful to the language and historical roots of the Fifth Amendment.

The harm from this infidelity is dramatically illustrated here. The federal government waited six years to begin its prosecution and did so only after the state completed its prosecution of Mr. Jackson, who believed the cases against him had ended. Essentially, the state and federal officials joined together to take a second bite at the apple against Mr. Jackson. This expansion of federal criminal jurisdiction has magnified the impact of *Abbate* and *Bartkus*, making necessary "a reassessment of those decisions timely from a practical standpoint" because "permitting successive state-federal prosecutions for the same act [appears] inconsistent with what is a most ancient principle in Western jurisprudence–that the government may not twice place a person in jeopardy for the same offense." *United States v. Grimes*, 641 F.2d 96, 100-01 (3d Cir. 1981).

69

This case present a dramatic example of the unfair and unconstitutional overreaching of the doctrine of dual sovereignty. This Court should issue a certificate of appealability, reconsider this claim, and vacate the judgment.

**VI.    THE DISTRICT COURT ERRONEOUSLY DENIED RICHARD JACKSON AN EVIDENTIARY HEARING ON AND FUNDS TO DEVELOP HIS MOTION TO VACATE WHERE THE EVIDENCE, TAKEN IN A LIGHT MOST FAVORABLE TO HIM, DID NOT CONCLUSIVELY SHOW HE WAS NOT ENTITLED TO RELIEF.**

**Standard of Review**: This Court appears to review de novo whether a district court holds an evidentiary hearing. *United States v. Lemaster*, 403 F.3d 216, 221 n.3 (4th Cir. 2005); *United States v. Witherspoon*, 231 F.3d 923, 926 (4th Cir. 2000).

**Discussion**: Richard Jackson was entitled to a hearing on his motion to vacate "unless the motion, files, and record conclusively show[ed] that he [was] not entitled to relief." *See* 28 U.S.C. § 2255. The district court failed to comport with either the statutory standard or legal precedent in denying Mr. Jackson's motion without an evidentiary hearing. This case must be remanded for an evidentiary hearing. Additionally, this case must be remanded with instructions for the district court to provide him with funding to acquire reasonably necessary services, *see* 18 U.S.C. § 3599, so Mr. Jackson can fairly litigate his claims.

A certificate of appealability may issue with respect to procedural issues that affect the fullness of consideration given by a district court to a habeas petitioner's claims for relief.

70

> [W]hen the district court denies a habeas petition on procedural grounds without reaching the prisoner's underlying constitutional claim, a COA should issue when the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling.

*Slack v. McDaniel*, 529 U.S. 473, 484 (2000). In this case, procedural issues are at the heart of the fairness of these proceedings, implicating Mr. Jackson's access to adequate resources to present and prosecute his motion, and to investigate, develop and present his claims in court. A certificate of appealabilty must issue where, as in Mr. Jackson's case, the record reflects that "the District Court did not give full consideration to the substantial evidence petitioner put forth in support of the prima facie case." *Miller-El v. Cockrell*, 537 U.S. 322, 341 (2003).

As discussed above in connection with Mr. Jackson's specific issues, not only could "jurists of reason . . . disagree with the district court's resolution of [Mr. Jackson's] constitutional claims," *Id*. at 327, but such jurists could also find that in many ways the district court "did not give full consideration to the substantial evidence" Mr. Jackson marshaled in support of his motion to vacate. Thus, the district court erred in denying the motion to vacate without conducting an evidentiary hearing and in denying his motions for adequate funding.

71

## A.    Standard for Granting an Evidentiary Hearing Under Section 2255.

The standard for granting an evidentiary hearing is clear.  *See Machibroda v. United States*, 368 U.S. 487 (1962).[26]  In *Machibroda*, the Court remanded for an evidentiary hearing to determine whether the movant's plea was involuntary because it was allegedly induced by promises made by the prosecuting attorney as to the length of the sentences that would be imposed.  The movant and the prosecutor filed conflicting affidavits on the factual matter of whether such promises were made.  The district judge decided, without a hearing, that the movant's allegations were false and denied the section 2255 motion.  *Machibroda* held the district court did not act in conformity with section 2255.

> This was not a case where the issues raised by the motion were conclusively determined either by the motion itself or by the "files and records" in the trial court.  The factual allegations contained in the petitioner's motion and affidavit, and put in issue by the affidavit filed with the Government's response, related primarily to purported

---

[26] *Machibroda* is cited in Rule 5 of the Rules Governing Section 2255 Proceedings, which concerns the government's answer and the movant's traverse. As the Advisory Committee Notes state:

> Numerous cases have held that the government's answer and affidavits are not conclusive against the movant, and if they raise disputed issues of fact a hearing must be held.  *Machibroda v. United States*, 368 U.S. 487, 494, 495 (1962); *United States v. Salerno*, 290 F.2d 105, 106 (2d Cir. 1961); *Romero v. United States*, 327 F.2d 711, 712 (5th Cir. 1964); *Scott v. United States*, 349 F.2d 641, 642, 643 (6th Cir. 1965); *Schiebelhut v. United States*, 357 F.2d 743, 745 (6th Cir. 1966); and *Del Piano v. United States*, 362 F.2d 931, 932, 933 (3d Cir. 1966).

Advisory Committee Notes to Rule 5, Rules Governing Section 2255 Cases.

72

occurrences outside the courtroom and upon which the record could, therefore, case no real light.  Nor were the circumstances alleged of a kind that the District Judge could completely resolve by drawing upon his own personal knowledge or recollection.

368 U.S. at 494-95; *see also United States v. Unger*, 665 F.2d 251, 254 (8ᵗʰ Cir. 1981)

("an evidentiary hearing should be held where. . . the factual allegations contained in

the petitioner's motion and affidavit relate primarily to purported occurrences outside

the courtroom and upon which the record could, therefore, cast no real light and

where the circumstances alleged are not of a kind that the District Judge could

completely resolve by drawing upon his own personal knowledge or recollection")

(citations and internal quotation marks omitted).

As *Machibroda* makes clear, an evidentiary hearing must be conducted when

there are material facts in dispute and these facts relate to events that occurred outside

the courtroom and, therefore, are not memorialized in the trial record.  These are

precisely the kinds of material facts which are in dispute here—namely, the actions

that trial counsel did and did not take in investigating and preparing the mitigation

case for Mr. Jackson's trial.  The facts regarding counsel's investigation and

preparation are not contained in the trial record, and to the extent that some of those

facts have been adduced in the section 2255 proceedings, in the form of affidavits,

sworn declarations, and previous statements in the record, there are numerous

conflicting statements with respect to the disputed issues of material fact.  As in

*Machibroda*, the only way these factual disputes can be resolved is through an

73

evidentiary hearing, at which witnesses can be called and questioned, and specific factual findings regarding counsel's investigation and preparation can be made.

As discussed above, there are numerous material facts that are in dispute in the record. For example:

- The district court found that the mitigation investigation in Mr. Jackson's case was adequately pursued, noting that the court granted funds for a mitigation investigator early in the case [JA 2011] and that the mitigation specialist herself gave an affidavit attesting to her work. [JA 2031] However, Mr. Belser refuted this assertion, stating that when he came into the case shortly before trial, very little had been done. [JA 251-52] The mitigation specialist's affidavit corroborates this account noting that she started gathering critical punishment phase evidence one month before trial. [JA 366]

- The district court found that trial counsel was not ineffective for failing to investigate and adequately challenge evidence that a stun gun was used during the crime. [JA 2066-80] The district court's decision was based primarily on its observation of the cross-examination of the government's witness, which it believed indicated that counsel had adequately prepared. The district court also stated that the cross-examination of the government's expert demonstrated that counsel consulted with Dr. Byrd, a forensic entomologist, and that information from that consultation was used to attack the government's case. [JA 2074-76, 2339] However, David Belser avers there was no pretrial decision about who would handle this evidence and the decision that he would cross-examine the government expert was made at the last minute. [JA 253-54] Moreover, Dr. Byrd's own declaration makes clear that he spoke only to Eric Foster, the lawyer who withdrew from the case prior to trial and he never mentioned a stun gun. [JA 2292-94] There is also no evidence, in light of the rocky relationship with co-counsel, Mr. Foster ever passed any information about his discussion with Dr. Byrd to Steve Lindsey.

As these examples demonstrate, this case is not one where the motion, files, and record conclusively show Mr. Jackson is not entitled to relief. There are a

74

number of disputed issues of material fact that cannot be resolved—must less conclusively resolved—on the existing record. The factual allegations contained in Mr. Jackson's motion and submitted affidavits and declarations relate primarily to occurrences outside the trial courtroom and upon which the record can, therefore, cast no real light. Moreover, the circumstances alleged are not of a kind that the district judge could completely resolve by drawing upon his own personal knowledge or recollection, as the district judge was not privy to any of the defense team's investigation and preparation of Mr. Jackson's case.

**B.    District Court Resolved Credibility Issues Without a Hearing.**

The district court resolved these factual matters based on a selective reliance on the submitted affidavits and declarations alone. Throughout its order, the district court credited pretrial statements, citing to them repeatedly in support of its resolution of the various claims. The district court, however, refused to allow any real process to understand the importance of the contradictory statements contained in trial counsel's declarations. The district court merely gave credence to selected pretrial statements of defense counsel because they were "contemporaneous as opposed to the allegations contained in [counsel's] sworn affidavit, made in the context of hindsight and to support a § 2255 motion." [JA 1993] In doing so, the district court acted contrary to clear precedent forbidding a district court from making credibility determinations based on the pleadings and affidavits alone. *See, e.g., United States*

75

*v. Robinson*, 238 Fed. Appx. 954 (4th Cir. 2007) (remanding for hearing, in part, because district court's decision relied on credibility determinations); *Raines v. United States*, 423 F.2d 526, 530 (4th Cir. 1970) ("When the issue is one of credibility, resolution on the basis of affidavits can rarely be conclusive.").

Every inference must be drawn in Mr. Jackson's favor where, as here, he pled facts that, if true, entitle him to relief. *See* 28 U.S.C. § 2255; *see also Townsend v. Sain*, 372 U.S. 293, 312-13 (1963) (requiring a hearing in federal habeas proceedings where the petitioner has alleged facts which, if proven, would entitle him to relief and where the district court has not resolved the merits of the factual dispute in a full and fair hearing); *accord Fontaine v. United States*, 411 U.S. 213, 215 (1973); *United States v. Nicholson*, 475 F.3d 241 (4th Cir. 2007) (holding that denial of section 2255 motion without hearing is akin to a grant of summary judgment and thus the facts must be viewed in light most favorable to movant). Yet the district court did not grant an evidentiary hearing. Accordingly, this case must be remanded.

**C.    District Court Wrongly Denied Requests for Expert Assistance**.

Mr. Jackson should be provided with the resources that he is entitled to by statute in order to be able to further develop his claims. A capital petitioner has a statutory right to qualified legal counsel prior to the filing of a formal, legally sufficient petition. *McFarland v. Scott*, 512 U.S. 849, 855 (1994). In construing the relevant statutory provision, 21 U.S.C. § 848(q), *McFarland* noted the statute created

76

a right to investigative and expert services upon a showing that such services were

"reasonably necessary" for the representation of the capital petitioner:

> Section 848(q)(4)(B) expressly incorporates 21 U.S.C. § 848(q)(9), which entitles capital defendants to a variety of expert and investigative services upon a showing of necessity … The services of investigators and other experts may be critical in the preapplication phase of a habeas corpus proceeding, when possible claims and their factual bases are researched and identified.

*Id.* (block quotation of § 848(q)(9) omitted).[27]  Although the statute does not define

"reasonably necessary," "Congress intended to provide prisoners with all resources

---

[27]  This statutory provision was repealed effective 9 March 2006 by the USA Patriot Improvement and Reauthorization Act of 2005, Pub. L. No. 109-177, Title II, §§ 221(4), 222(a), 120 Stat. 192, 231-32 (2006), and recodified, in pertinent part, at 18 U.S.C. § 3599.  It provides:

> (a)(1)  Notwithstanding any other provision of law to the contrary, in every criminal action in which a defendant is charged with a crime which may be punishable by death, a defendant who is or becomes financially unable to obtain adequate representation or investigative, expert, or other reasonably necessary services at any time either-
> (A) before judgment; or
> (B) after the entry of a judgment imposing a sentence of death by before the execution of that judgment;
> shall be entitled to the appointment of one or more attorneys and the furnishing of such other services in accordance with [subsection (f)].
> …
> (f)  Upon a finding that investigative, expert, or other services are reasonably necessary for the representation of the defendant, whether in connection with issues relating to guilt or the sentence, the court may authorize the defendant's attorneys to obtain such services on behalf of the defendant and, if so authorized, shall order the payment of fees and expenses therefore.

18 U.S.C. § 3599 (2007).

needed to discover, plead, develop, and present evidence determinative of their colorable constitutional claims." *Patrick v. Johnson*, 48 F. Supp. 2d 645, 6446 (N.D. Tex. 1999).

The district court deprived federal habeas counsel of the resources necessary to properly develop the facts of Mr. Jackson's case. Despite counsels' timely, specific, thorough motions to the district court requesting investigative assistance and the assistance of expert witnesses, the district court granted only $1,000 for investigation and denied funding for necessary expert assistance. [JA 1510-20, 1541-44, 1671-83, 2433-68] Despite these denials, habeas counsel conducted a limited investigation and discussed aspects of this case with several experts in an effort to suggest the outlines of the claims that might be developed when proper assistance and a hearing was provided. The result was precisely what counsel predicted: strong support for Mr. Jackson's challenges to his conviction and death sentence.

This Court should remand for appropriate factual development and discovery so that Mr. Jackson has the opportunity to prove his allegations, by (1) presenting live testimony from Mr. Jackson's family members and other witnesses concerning his character and background which would have established a strong case in mitigation which went unpresented to the jury; (2) presenting expert testimony from forensic specialists who have concluded, without hesitation, that the marks on the victim's body were not caused by a stun gun but rather were wounds created by insects; and

(3) presenting testimony about the new evidence that Bob Lunsford was involved in these crimes.  Thus, the judgment must be reversed.

## CONCLUSION

For the reasons stated herein, Richard Allen Jackson respectfully requests that the district court's denial of his motion to vacate be reversed and that the judgment against him be vacated.  In the alternative, he respectfully requests that the matter be remanded for an evidentiary hearing.

This the 30th day of November, 2010.

**RUDOLF, WIDENHOUSE & FIALKO**

/s/ M. Gordon Widenhouse, Jr.
M. Gordon Widenhouse Jr.
312 West Franklin Street
Chapel Hill, NC 27516
Telephone:  919-967-4900
Telefax:      919-967-4953

Shelagh R. Kenney
CENTER FOR DEATH
PENALTY LITIGATION
201 West Main Street, Suite 301
Durham, North Carolina  27701
Telephone:  (919) 956-9545
Telefax:      (919) 956-9547

**Counsel for Appellant**

## CERTIFICATE OF COMPLIANCE

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 28.1(e)(2) or 32(a)(7)(B) because:

[ X ] this brief contains [*19,947*] words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

[   ] this brief uses a monospaced typeface and contains [*state the number of*] lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

[ X ] this brief has been prepared in a proportionally spaced typeface using [*Corel WordPerfect 12*] in [*14pt Times New Roman*]; *or*

[   ] this brief has been prepared in a monospaced typeface using [*state name and version of word processing program*] with [*state number of characters per inch and name of type style*].


Dated:   November 30, 2010                                     /s/ M. Gordon Widenhouse, Jr.
                                                                              *Counsel for Appellant*

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that on this 30th day of November, 2010, I caused this Brief of

Appellant to be filed electronically with the Clerk of the Court using the CM/ECF

System, which will send notice of such filing to the following registered CM/ECF

users:

Jeffrey B. Kahan
Office of the U.S. Attorney
1331 F Street, NW
Washington, DC 20530
(202) 305-8910

*Counsel for Appellee*

I further certify that on this 30th day of November, 2010, I caused the required

number of bound copies of the Joint Appendix to be hand filed with the Clerk of this

Court and one copy of the same to be served, via UPS Ground Transportation, to all

case participants, at the above listed addresses.

/s/ M. Gordon Widenhouse, Jr.
*Counsel for Appellant*